803 So.2d 212 (2001)
STATE of Louisiana
v.
Roy SARRIO.
No. 01-KA-543.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2001.
*215 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant D.A., Alison Wallis, Assistant D.A., Gretna, LA, for Plaintiff-Appellee.
Brian P. Brancato, Louisiana Appellate Project, New Orleans, LA, for Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and SUSAN M. CHEHARDY.
EDWARD A. DUFRESNE, JR., Chief Judge.
The Jefferson Parish District Attorney filed a bill of information charging defendant, Roy Sarrio, with one count of racketeering, LSA-R.S. 15:1352-1353, and four counts of possession with intent to distribute marijuana, LSA-R.S. 40:966(A). The charges proceeded to trial before a twelve person jury which found defendant guilty of one count of racketeering and two counts of possession with intent to distribute marijuana. With regard to the two remaining counts of possession with intent to distribute, the jury returned verdicts of not guilty.
The trial court thereafter sentenced defendant to thirty years imprisonment at hard labor on each of the three convictions. He was further sentenced, pursuant to the drug enhancement provisions of LSA-R.S. 40:982, to sixty years at hard labor. The judge ordered that all sentences be served concurrently. From these convictions and sentences, defendant now appeals.

FACTS
Bruce Harrison, a Jefferson Parish Sheriffs Officer, worked undercover narcotics details. In April 1996, while disguised as a construction worker, Harrison was introduced to Keith Marcel and told Marcel that he wanted to buy marijuana.
On April 23, 1996, a purchase of one-fourth pound of marijuana was made from Marcel. The street value of the purchase was $275-$350. The drugs were supplied by someone named "Jenson."
On April 25, 1996, Officer Harrison purchased three ounces of marijuana from Marcel. The drugs were supplied by someone named "William West." On April 29, 1996, Officer Harrison made two drug purchases from Marcel and he was introduced to the supplier, Roy Sarrio, whom Marcel referred to as "The Man." Officer Steven Rayes kept Officer Harrison under surveillance. Officer Harrison was equipped with an audio device and, on two occasions, with a video device. Officer Rayes had a receiver to monitor the transactions. *216 Officer Harrison first went to Marcel's house and told Marcel that he wanted to purchase one-fourth pound of marijuana for which he paid Marcel $350. The men got into Officer Harrison's truck and rode to the 500 block of Second Street. Officer Harrison later discovered the defendant lived at 529 Second Street. When the pair arrived at that location, Marcel instructed Harrison to pull his vehicle over and let Marcel out, which he did. Officer Harrison was told to drive around and then return to the point of drop-off. Before leaving the area, Officer Harrison saw Marcel and Roy Sarrio walking together. Upon his return, Marcel entered Officer Harrison's truck and commented that "now we're dealing with the man." Marcel told Officer Harrison that he was going to be given a pound of marijuana, on consignment. Marcel indicated that Officer Harrison should give him $350, sell the drugs, and then give Marcel the remainder of the money (i.e., $1,050). Marcel told Officer Harrison that the drugs were ordered and would be delivered by cab. He gave Officer Harrison a piece of paper with the name "Roy," a pager number "457-7984" and the pager code "1400". The pager and number were later traced to the defendant. Officer Harrison and Marcel rode around until about 8:00 p.m. when they saw a cab at Marcel's house, which was located at 421 Third Avenue. The cab had the name "Glenn Cab" on the side of the vehicle and Officer Harrison would later discover the driver was William Chauncey, a courier for Roy Sarrio. Marcel exited Harrison's truck, entered his house, and returned a short time later to Officer Harrison's truck with a pound of marijuana. Officer Harrison paid Marcel $350 in pre-recorded currency for the delivery. The transaction was captured on audiotape.
On May 6, 1996, Officer Harrison called the pager number he had been given and got no response. Officer Harrison, equipped with a transmitter and under surveillance by Officer Rayes, brought $1,050 in recorded money to Marcel's neighborhood. Officer Harrison located Marcel and gave Marcel the money that was owed. Marcel told Officer Harrison that the defendant was out of drugs, but he was awaiting a delivery of 500 pounds. Officer Harrison gave Marcel his pager number and told him to have the defendant call when the drugs arrived. The transaction was recorded on tape.
On May 14, 1996, Officer Harrison used the pager number he had been given without success. Officer Harrison drove around to find Marcel and was able to locate him. Marcel got into Officer Harrison's truck and he told Officer Harrison that the drugs were in town, but they had not yet been delivered to Sarrio.
On May 17, 1996, Officer Harrison received a page and the code "1400" and he knew Sarrio was trying to contact him. Officer Harrison called the cell phone number he was given "453-3345" but was unsuccessful in reaching Sarrio. Later, Officer Harrison did reach the defendant and recorded the conversation. The defendant asked whether Harrison had seen Marcel, but Sarrio did not want to talk about money or the drug weight over the phone. Officer Harrison later got a transmitter and $500 in recorded money before going in search of Marcel. Officer Harrison searched on Fourth Street, where Sarrio was said to have a body shop, and Second Street, where he lived. Officer Harrison located Marcel and Marcel entered Harrison's truck for a ride to Marcel's house. During the ride, Marcel told Officer Harrison that the drug price had dropped to $325 for one-fourth pound of drugs. At the time, Marcel had seven one-fourth pound plastic bags of the drug for Harrison, with a total price of $2,100. Officer *217 Harrison gave Marcel $500. Marcel went beneath his house and retrieved an ice chest with the drugs. The chest contained one large plastic bag, with seven one-fourth pound bags. The men talked about future drug deals involving greater quantities and lower prices. Marcel asked Officer Harrison to smoke some of the drugs. Officer Harrison declined and made an excuse that he had a prior DWI conviction and could not smoke the drugs because it would be too risky since he had to cross the Mississippi River Bridge. The May 17, 1996 transaction was recorded on tape.
On May 24, 1996, at approximately 1:45 p.m., Officer Harrison received a page from a Westbank number (# 362-0863), with the code "1400." The call was from Roy Sarrio who wanted Officer Harrison to come see some new drugs he had received. Because the surveillance team needed time to assemble, Officer Harrison told the defendant he could not come until about 6 p.m., when he finished work. Sarrio told Officer Harrison to get in touch with Marcel. Officer Harrison recorded this conversation.
On May 24, 1996, Officer Harrison located Marcel and went to his house. The men talked about the amount and price of drugs. Marcel went under his house and retrieved a large plastic bag containing a pound of marijuana from the ice chest. Officer Harrison gave Marcel $1,600. Marcel wanted to give Officer Harrison 2 to 3 pounds of the drug on the next day. Officer Harrison said that they could only meet early in the morning, because Officer Harrison was leaving town for the weekend. The conversation was recorded on tape.
On Tuesday afternoon, May 28, 1996, Officer Harrison paged Roy Sarrio. Sarrio returned the page and told Officer Harrison that Marcel had 3 pounds of marijuana for Officer Harrison. Officer Harrison secured $1,200 in recorded money for the purchase, and he took a transmitter with him. Officer Harrison searched for Marcel, without success. He then paged Sarrio to inform him that he did not find Marcel. Sarrio told Officer Harrison that he would find Marcel and make sure Marcel found Officer Harrison. These conversations were recorded.
Officer Harrison went out to find Marcel. Upon locating him, Marcel got into the truck with Officer Harrison and Marcel told him that they needed to find the defendant. The men drove to Second Street, Fourth Street and Oak Street, where Sarrio's wife resided. They also rode to defendant's body shop, but were not successful in finding him. The men once again drove to the 500 block of Second Street. At 529 Second Street they located the defendant. He was found sitting on the back of his BMW. Officer Harrison gave Marcel $1,200 and Marcel placed the money in his shirt pocket. Marcel left the truck and Officer Harrison was told to circle the corner. Before turning the corner, Officer Harrison looked into his rear-view mirror and saw Marcel retrieve the money from his pocket and hand it to Sarrio. During this time Jefferson Parish Sheriff's Officer, Sal Castagnetta, was conducting surveillance in the area. As Officer Harrison returned to the scene, Marcel approached the truck and instructed him to go to the Burger King located at Westbank Expressway and Farrington Street to wait.
Officer Castagnetta followed the defendant as he drove from his residence on Second Street to 1108 Oak Avenue, where his wife lived. The defendant parked the BMW and entered the residence. He exited the residence with a package the size of a small shoebox. The defendant placed the package in his vehicle and drove to the *218 body shop located at 7423 Fourth Street. In a van, two white men, later identified as Marcel and Charles McGehee, pulled into the body shop. They met with the defendant and talked. Thereafter, the defendant reached into his vehicle, retrieved the box and gave it to McGehee.
Officer Harrison had waited at the Burger King for about 20 minutes before the van arrived with Marcel and McGehee. Officer Harrison was instructed to go to Marcel's house. Once there, Marcel went to the back of the house, and shortly thereafter, he returned and gave Officer Harrison the ice chest that contained a brick of marijuana and some loose marijuana. Once Marcel delivered the drugs, the surveillance team arrested him. The transaction was recorded on tape. It was learned that McGehee was in a van at the corner bar. Officer Harrison went to the bar and signaled to McGehee to exit. When he did, he was arrested. A search of McGehee turned up a pager that was leased to defendant Sarrio. Tanya Sarrio was also arrested on May 29, 1996. Keith Marcel and Tonya Sarrio each gave a statement to police.
Roy Sarrio was located in the early morning of May 29, 1996 at Bail Bonds Unlimited, and he was arrested. A search of his person resulted in the seizure of a pager and $80 in pre-recorded bills. On May 30, 1996, William Chauncey was arrested. He was searched and a pager was recovered that was registered to the defendant.
Search warrants were secured for Marcel's house at 421 Third Street and defendant's residences at 529 Second Street, where he resided, and at 1108 Oak Street, where his wife lived. A search of Marcel's residence resulted in the seizure of the ice chest in which he kept the drugs, a bill for Chauncey's pager, and an energy bill for Tonya Sarrio.
A search of the defendant's Second Street residence resulted in the seizure of a Sunbeam scale, a two-way radio, and assorted papers. A search of the defendant's residence on Oak Street resulted in the seizure of a box containing 35 bricks, which later tested positive for marijuana. The bricks weighed 73.5 pounds and had a street value of $73,000. Also discovered was a lockbox with $5,400, of which $1,280 was pre-recorded money. Officers also seized some plastic bags, which contained a substance that later tested positive for marijuana. Also seized were several gold chains, one with the name "Mr. Roy", a Lorison .380 pistol and magazine, a second two-way radio and a pager, a radio charger and phone batteries, and photographs and papers of Roy Sarrio.
Based on these transactions, defendant was charged with one count of racketeering and four counts of possession with intent to distribute marijuana, and subsequently convicted of one count of racketeering and two counts of possession with intent to distribute marijuana. On appeal, he challenges his convictions and sentences, asserting eight assignments of error. We will now address defendant's arguments.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment, defendant contends that the trial court committed reversible error by failing to grant a mistrial when the clerk misread the bill of information to the jury to include charges that did not pertain to him.
In the present case, when the deputy clerk of court read the jury the bill of information, she mistakenly referred to two acts of distribution engaged in only by Keith Marcel, a former co-defendant, who pled guilty and testified for the state. She *219 mistakenly referred to these two counts of distribution (contained in counts 2 and 3 and occurring on April 23, 1996 and April 25, 1996) as being charges against the defendant. The state realized the mistake, immediately alerted the court, and suggested that the mistake be cured by rereading the bill to the jury. The defendant objected and moved for a mistrial. The court denied the motion for mistrial but instructed the clerk to reread the correct charges to the jury. The defendant now complains that the prejudicial effect of misreading the bill of information could not be overcome by the cautionary instruction, and thus, the trial court erred in denying the motion for mistrial.
Prejudicial remarks, under certain circumstances, present a basis for mistrial. LSA-C.Cr.P. art. 770 provides, in pertinent part, as follows:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial, or in argument, refers directly or indirectly to:
. . . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
. . . .
An admonition to the jury shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
A mistrial is a dramatic remedy and, except in instances in which the mistrial is mandatory, a mistrial is warranted only when the trial error results in substantial prejudice to the defendant, depriving him of a fair trial. State v. Eskano, 00-101 (La.App. 5 Cir. 1/30/01), 779 So.2d 148.
In this case, a mistrial was not mandated pursuant to LSA-C.Cr.P. art. 770. A review of the clerk's reading of the bill indicated no clear comment on other crimes committed by this defendant. State v. Rhodes, 95-54 (La.App. 5 Cir. 6/28/95), 657 So.2d 1373, writ denied, 95-2265 (La.3/14/97), 690 So.2d 28. Moreover, the error by the clerk was promptly corrected by a rereading of certain portions of the bill. Also, at trial, the evidence of Marcel's involvement in distribution of drugs on April 23 and April 25, 1996 was presented as part of the overall transaction.
Under these circumstances, the defendant did not suffer substantial prejudice nor was he deprived of a fair trial. Accordingly, the trial court did not err in denying defendant's motion for mistrial based on the improper reading of the bill of information. This assigned error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assigned error, defendant contends that the closure of the courthouse at 4:45 p.m. each day during trial of this matter denied him a fair and public trial necessitating the reversal of his conviction.
Both the United States and Louisiana Constitutions afford the accused the right to a public trial. U.S.C.A. Const. Amend. 6; La. Const. Art. 1, Sec. 16; Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). However, this right to a public trial is not absolute, and it may give way to other rights or interests, such as the defendant's right to a fair trial or the prosecution's interest in *220 preventing the disclosure of sensitive information. Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). The Waller court noted that such circumstances were rare and the balancing of interests must be carefully taken.
During trial in the present case, defense counsel consistently objected to the proceedings being conducted after 4:45 p.m. each day, the time when the doors to the courthouse were locked. He specifically requested that the courthouse remain open and that the court instruct security to make provisions to allow anyone who wishes to come and observe the proceedings. While the court denied defendant's request to keep the courthouse open, the trial judge did afford defendant the opportunity to provide a list of names of individuals who would like to be admitted to the courthouse and provisions for their admittance would be made. Defendant objected and filed a motion for mistrial on the basis of the closure of the courthouse each day at 4:45 p.m.
This court, in State v. Dauzart, 99-730 (La. App 5 Cir. 11/30/99), 749 So.2d 806, 810-811, writ granted, 99-3471 (La.6/2/00), 762 So.2d 1114, rev'd and remanded on other grounds (i.e., defendant's right to testify), 99-3471 (La.10/30/00), 769 So.2d 1206, was faced with a similar set of facts and found that the process of restricting access to the courthouse after 4:45 p.m. did not deprive defendant of his right to a public trial. The Dauzart court stated as follows:
The closure policy at the courthouse was adopted for security reasons. In the interest of fairness, the trial judge issued a permanent order allowing Dauzart to advise him regarding any individual who wished to be present after 4:45 p.m. so that accommodations could be made. No such effort was made by Dauzart or by defense counsel. On March 18, 1998, the first day of the trial, court recessed at 4:53 p.m. On March 19, 1998, the jury was excused at 5:50 p.m. and court recessed shortly thereafter at 6:30 p.m. On March 20, 1998, the last day of trial, the jury's verdict was rendered at 2:35 p.m. and court was then recessed.
Dauzart was not deprived of his right to a public trial. He was given every opportunity to notify the trial court if there was anyone who needed to enter the courthouse after 4:45 p.m. on the days in question. The trial court's ruling was not so egregious as to warrant a reversal of the trial court's judgment. The judgment must be affirmed.
Likewise, in the present case, we find that defendant was not deprived of his right to a public trial. We note that the courthouse was not closed all day, but only after normal working hours, and then only partially. The manner of closure was narrowly defined, because measures were taken by the court to insure access to the ongoing proceedings. Safety and security were the "overriding interest" expressed by the court for this action. The court took reasonable measures to insure safety as well as access. Defendant was given every opportunity to notify the court if there was anyone who needed to enter the courthouse after 4:45 p.m. on the days in question. Based on the foregoing discussion, we find no merit to the argument raised by defendant in this assigned error.

ASSIGNMENT OF ERROR NUMBER THREE
In his third assigned error, defendant contends that he was denied the right to confrontation and a fair trial when the court sustained an objection to a question he asked Officer Steven Rayes, on cross-examination, *221 concerning the failure to dust for fingerprints on a box seized as evidence, which contained cash allegedly belonging to the defendant.
The following line of questions occurred during the cross-examination of Officer Steven Rayes:
MR. REGAN [defense]:
And would you take a close look at that metal box and see if there's any evidence of it being dusted to see who put the fifty-four hundred bucks inside?
WITNESS:
No. There's no evidence of any dust on there, sir. Like I said, I didn't process that scene, so I can't indicate why it wasn't dusted or not.
MR. REGAN:
Being an officer with seven years experience, I mean, you've been trained to know that B well, doesn't it make common sense to dust a box that had all that money in it to see who has been in and out of it?
MR. KELLY [district attorney]:
Objection.
MR. REGAN:
Basis.
MR. KELLY:
Repetitive. Asked and answered. He stated he was not there, Judge, and did not process this scene.
THE COURT:
That's correct. The officer
MR. REGAN:
No. That's not
THE COURT:
has testified that he was not there for the scene processing, Mr. Regan.
MR. REGAN:
And that's not the question. Your Honor.
I just asked him with seven years of experience, doesn't it make sense, common sense, to dust this box that supposedly fifty-four hundred bucks came out. I'm asking him that based on seven years experience.
THE COURT:
The objection is sustained.
MR. REGAN:
Note my objection.
The defendant moved for a mistrial and stated the following:
MR. REGAN:
This question clearly asks him as a police officer based on his experience, not what happened that night. This is a straightforward common sense based on seven years of police experience. It has nothing to do with Mr. Quentin Kelly's objection.
And if I'm not permitted to do that, my client is being denied his constitutional right to cross-examine the witness that the State put on.
THE COURT:
Your motion is denied.
MR. REGAN:
Note my objection.
(R., pp. 757-759.)
Officer Rayes was neither called nor qualified as an expert witness. He was called as a fact witness who took part in surveillance during this undercover operation.
To the extent that he was a fact witness, who testified that he did not handle the processing of evidence in this case, the trial court correctly sustained the state's objection to the defendant's inquiry. A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. LSA-C.Cr.P. art. 607.
*222 To the extent that the question posed to Officer Rayes called for his opinion as a law enforcement officer, the trial court correctly sustained the state's objection to the defendant's inquiry. Officer Rayes was not first qualified as an expert and, for that reason, was precluded from giving his opinion. LSA-C.E. arts. 701-702.
Officer Harrison processed the evidence in this case and he testified at trial. Defendant had an opportunity to question him regarding fingerprints analysis concerning this item of evidence and defendant failed to do so. Under these circumstances, he cannot now complain that he was denied the right of effective cross-examination. For these reasons, the argument raised by defendant in this assigned error lacks merit.

ASSIGNMENT OF ERROR NUMBER FOUR
In this assignment, defendant contends that the trial court erred in allowing the jury to hear a taped statement given by the defendant's wife, Tonya Sarrio, to Officer Harrison. He reasons that, since Mrs. Sarrio invoked the spousal privilege at trial, the statement should not have been admitted.
The Louisiana Code of Evidence provides for both an evidentiary and testimonial privilege for married persons. LSA-C.E. arts. 504-505. With some limited exceptions, none of which apply to this case, each spouse has a privilege during and after the marriage to refuse to disclose, and to prevent the other spouse from disclosing, confidential communications with the other spouse while they are husband and wife. LSA-C.E. art. 504(B). A communication is considered "confidential" if it is made privately and is not intended for further disclosure unless such disclosure is itself privileged. LSA-C.E. art. 504(A). Furthermore, in a criminal case, a witness spouse has a privilege, during the marriage, not to testify against the other spouse. LSA-C.E. art. 505.
In discussing the source article for LSA-C.E. arts. 504-505 (i.e., LSA-R.S.15:461), the Louisiana Supreme Court noted the distinction to be drawn between the evidentiary and testimonial privilege. In State v. Bennett, 357 So.2d 1136, 1139-1140 (La.1978), the court stated the following:
This statute creates two distinct privileges. The first of these is the privilege which attaches to private conversations between husband and wife and which may be asserted by the defendant-spouse. Secondly, the statute establishes a privilege in favor of a spouse called to testify against the other spouse by providing that neither spouse shall be compelled to be a witness against the other in a criminal proceeding. The exercise of this privilege rests with the testifying spouse alone and may not be invoked by the defendant-spouse.
A privilege may be waived if the person upon whom the privilege has been conferred voluntarily discloses any significant part of the privileged matter. LSA-C.E. art. 502(A). If a spouse waives the right to testimonial privilege, the waiver gives the spouse the right to testify against the other spouse as to non-privileged evidence. State v. Bennett, supra.
The record reveals that, on the date of her arrest, May 29, 1996, Tonya Sarrio gave a voluntary statement to Officer Harrison that her husband, Roy Sarrio, was the one who owned the drugs found at her house. She also told Officer Harrison that the money found in the lock-box belonged to her husband, Roy Sarrio. She denied receiving money or drugs for *223 keeping these items in her residence on Oak Street. She said her actions were prompted by fear.
Tonya Sarrio was called by the state as a witness at her husband's trial. When called, she invoked her spousal privilege pursuant to LSA-C.E. art. 505 and chose not to testify against her husband. The state then indicated that it would nonetheless seek to introduce the statement that Mrs. Sarrio made to Officer Harrison. The defendant lodged an objection, arguing that this would violate defendant's spousal privilege and that he would be unable to conduct cross-examination. Defendant moved for a mistrial, which was denied by the trial judge. During the direct examination of Officer Harrison, the taped interview of Tonya Sarrio, previously given to Officer Harrison, was played for the jury. At that time, the defendant again objected and moved for a mistrial, which was denied.
In this case, Mrs. Sarrio exercised her spousal testimonial privilege and was excused from testifying at trial against her husband pursuant to LSA-C.E. art. 505. However, the taped statement Mrs. Sarrio gave to authorities was not a "confidential communication" subject to the spousal evidentiary privilege provided for in LSA-C.E. art. 504. In the statement she stated what she knew of her own knowledge and observation; namely, that the drugs and money found at her house belonged to her husband. The information given to Officer Harrison was not a "confidential communication with the other spouse" nor is there any indication that it was derived from such a communication. Under these circumstances the statement could not be excluded on the basis that it was privileged. Since the information is not privileged, it did not violate Mr. Sarrio's spousal privilege.
Defendant next objects to the statement on the basis that he had no ability to cross-examine the witness who gave the statement.
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial, offered in evidence to prove the truth of the matter asserted. LSA-C.E. art. 801. Hearsay evidence is not admissible except as otherwise specified in the Code of Evidence or other legislation. LSA-C.E. art. 802. Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability. State v. Martin, 458 So.2d 454 (La.1984).
In this case, Officer Harrison testified that Mrs. Sarrio gave a statement to him. Thereafter, the taped statement was played. Normally such a statement would constitute inadmissible hearsay. However, the statement given to Officer Harrison by Mrs. Sarrio was a statement against interest by an unavailable witness, and thus, fell within one of the exceptions to the hearsay rule. See LSA-C.E. art. 804 A(1) and B(3). If an out-of-court statement by an unavailable witness falls firmly within the hearsay exception for its admissibility, reliability is inferred and the confrontation right is not violated. State v. Myers, 584 So.2d 242 (La.App. 5 Cir. 1991), writ denied, 588 So.2d 105 (La. 1991), cert. denied, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992).
In her statement, Mrs. Sarrio implicated her husband in this crime, but she also implicated herself by admitting that she knew what he was doing and she assisted him to the extent that she enabled him to keep the contraband and drug proceeds at her house. The statement was clearly against her interest and it was corroborated by the testimony of the co-conspirators *224 and the undercover and surveillance officers in this case. For these reasons, the taped statement was admissible and presumed reliable, even absent the defendant's ability to cross-examine the unavailable witness. Accordingly, the arguments raised in this assigned error are without merit.

ASSIGNMENTS OF ERROR NUMBERS FIVE AND SIX
In these two assignments, defendant asserts that the trial court erred in sentencing him pursuant to La. R.S. 40:982, the drug enhancement statute, and further that the sentences imposed were excessive. We will first address the issues which relate to the trial court's actual authority to sentence defendant pursuant to LSA-R.S. 40:982, which reads as follows:
A. Any person convicted of any offense under this part, if the offense is a second or subsequent offense, shall be sentenced to a term of imprisonment that is twice that otherwise authorized or to payment of a fine that is twice that otherwise authorized, or both. If the conviction is for an offense punishable under R.S. 40:966(B), R.S. 40:967(B), R.S. 40:968(B) or R.S. 40:969(B), and if it is the offender's second or subsequent offense, the court may impose in addition to any term of imprisonment and fine, twice the special parole term otherwise authorized.
B. For purposes of this section, an offense shall be considered a second or subsequent offense, if, prior to the commission of such offense, the offender had at any time been convicted of any violation of this state, the United States, any other state of or any foreign country, relating to the unlawful use, possession, production, manufacturing, distribution or dispensation of any narcotic drug, marijuana, depressant, stimulant, or hallucinogenic drugs.
Defendant first complains that the trial court erred in using his 1989 drug conviction for enhancement purposes because, at the time of the taking of his plea for that offense, he was not informed that it could form the basis of enhancement in the future.
The requirements that the trial court must comply with in accepting a guilty plea are set forth in LSA-C.Cr.P. art. 556.1. The codal provision was enacted in 1997, by Act 1061, Section 1 and became effective on August 15, 1997. This codal provision contains the following requirement: "LSA-C.Cr.P. art. 556.1. Plea of guilty or nolo contendere in a criminal case; duty of the court. E. In any case where a subsequent offense carries an enhanced penalty, the court shall inform the defendant of the penalties for subsequent offenses."
The defendant's predicate drug conviction occurred on May 8, 1989. At the time, LSA-C.Cr.P. art. 556.1 and subsection E did not exist. Moreover, the courts have given this statute prospective application only. State v. Phillips, 99-1629 (La.App. 1 Cir. 5/12/00), 762 So.2d 172; State v. Demease, 33-047 (La.App. 2 Cir. 4/5/00), 756 So.2d 1264, writ denied, 00-1488 (La.5/25/01), 792 So.2d 750. More importantly, the Louisiana Supreme Court has steadfastly held that this is not one of the constitutionally mandated rights of which a defendant must be informed in order that his plea can be found to be free and voluntary. State v. Guzman, 99-1528 (La.5/16/00), 769 So.2d 1158. For these reasons, this particular argument lacks merit.
*225 Defendant next argues that LSA-R.S. 40:982 should not apply to him because his first conviction was for distribution of cocaine and his second convictions involved the distribution of marijuana. Hence he reasons that these are not the "same" offense for purposes of this statute.
In order to properly preserve an error for review, the defendant must object at trial and state the grounds for the objection. LSA-C.Cr.P. art. 841(A). Since this ground for objection was not first presented at trial, it was not preserved for appeal. Moreover, we note the clear intent of LSA-R.S. 40:982 is to punish repeat drug offenders. The statute clearly provides that a person "convicted of any offense under this part" is subject to enhancement. Therefore, this portion of defendant's argument is also without merit.
While we believe that the trial judge was authorized to impose a sentence pursuant to LSA-R.S. 40:982, we must nonetheless vacate the sentences imposed for the reasons set forth in Assignment of Error Number Eight, and remand the matter for resentencing. Accordingly, at this time, we find it unnecessary to address defendant's arguments that the sentences imposed were excessive and that the trial judge was not mandated to impose a sentence of "twice that authorized" (sixty years), and in fact, could have imposed a sentence of ten years pursuant to the drug enhancement provisions of LSA-R.S. 40:982.

ASSIGNMENT OF ERROR NUMBER SEVEN
By this assignment, defendant challenges the sufficiency of the evidence used to convict him. He contends that the state failed to prove that he engaged in an "enterprise," apart from the marijuana distribution enterprise and therefore there was insufficient evidence to convict him of racketeering. LSA-R.S. 15:1353.
The constitutional standard of review for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mitchell 99-3342 (La.10/17/00), 772 So.2d 78. In applying this standard, the reviewing court will not access credibility nor reweigh the evidence. State v. Rosiere, 488 So.2d 965 (La.1986). The trier of fact shall evaluate credibility and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27.
Defendant was convicted of one count of racketeering occurring between April 23, 1996 and May 20, 1996 and two counts of distribution of marijuana, namely those that occurred on May 24, 1996 and May 28, 1996 respectively.
The Louisiana Racketeering Act is contained in LSA-R.S. 15:1351-1356. The activities prohibited by the act are set forth in LSA-R.S. 15:1353, and provide in pertinent part, as follows:
B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain directly or indirectly, any interest in or control of any enterprise or immovable property.
C. It is unlawful for any person employed by, or associated, with any enterprise knowingly to conduct or participate in directly or indirectly, such enterprise through a pattern of racketeering activity.
*226 A "racketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime which is punishable under the Uniform Dangerous Substances Act, which would include LSA-R.S.40:966(A). LSA-R.S. 15:1352(A)(11).
An "enterprise" is defined as "any individual, sole proprietorship, partnership corporation or other legal entity, or any un-chartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." LSA-R.S. 15:1352(B).
The term "pattern or racketeering activity" means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992 and that the last of such incidents occurs within five years after the prior incident of racketeering. LSA-R.S. 15:1352(C).
In State v. Touchet, 99-1416 (La.App. 3 Cir. 4/5/00), 759 So.2d 194, the court noted that the Louisiana Drug Racketeering Statutes are modeled after the federal "RICO" legislation. In that regard, the court turned to federal interpretations, for guidance in explaining the components of the state statute. The court, in Touchet, supra at 197-198, stated as follows:
The enterprise is an entity ... a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by participants in the enterprise.... The `enterprise' is not the `pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government....
[A]n enterprise must be either a legal entity or an association-in-fact. Further, an association-in-fact enterprise must: (1) have an existence separate and apart from the pattern of racketeering, (2) be an ongoing organization, and (3) have members functioning as a continuing unit as shown by a decision-making structure.
(Citations omitted).
The facts of the present case are clearly distinguishable from those in State v. Touchet, supra, which defendant relies upon to support his argument that the state failed to prove that he was involved in an enterprise apart from the marijuana distribution enterprise. In the present case, in addition to the testimony of the undercover officer and his surveillance team, which illustrated the various drug transactions, the testimony of the principals to the operation gave insight into the workings of the organization itself. Particularly, four members of the organization testified for the state.
William Chauncey was a cab driver who became a courier for the head of the operation, Roy Sarrio. Chauncey, who initially transported people for Sarrio, later transported packages of marijuana for him in return for money. Roy Sarrio gave him the drugs and he was instructed where to *227 deliver them by Sarrio. On April 29, 1996, he was given a one-pound delivery to take to Keith Marcel, the front for the operation.
A second member of the operation, Charles McGehee, testified that he "moved marijuana around" for Roy Sarrio. As illustrative of his involvement, this witness testified regarding a transaction that occurred in May 1996. McGehee indicated that he was with Roy Sarrio when Sarrio arranged for a 400-500 pound delivery from a group of Mexicans. McGehee helped Sarrio pick up the delivery and bring it to Tonya Sarrio's house for storage. Thereafter, Sarrio instructed McGehee to pick up Marcel at the Burger King and meet him at the body shop where Sarrio would be given a delivery of drugs. He was then directed to take Marcel and the drugs for delivery to undercover agent Harrison who was waiting at Marcel's house. Charles McGehee indicated that he was paid by Sarrio for his involvement in the operation and he did not receive drugs as remuneration.
The defendant's wife gave a statement shortly after her arrest, wherein she indicated that her husband stored his drugs and drug money at her house on Oak Street. She admitted getting money from her husband, but denied that it was for keeping the contraband.
Keith Marcel, who was billed as a co-defendant with Roy Sarrio in this case, entered a plea agreement and testified for the state. Marcel indicated that he had been a friend of Roy Sarrio for six years and was recruited for the drug business by Sarrio. Marcel recounted at least six drug sales and four of those were with Roy Sarrio. Concerning his involvement with Roy Sarrio, Marcel indicated that Sarrio supplied the drugs, set the terms for the sale and received the money from the sales. In these transactions, Marcel acted as the "front man" in the sales. He would meet with Sarrio personally or communicate with the use of phones and beepers. Marcel would pick up the drugs from Sarrio or Sarrio would have them delivered to him by Chauncey or McGehee. Marcel was paid for his involvement in the operation and sometimes received drugs as payment.
From the evidence presented, it is clear that there was an "enterprise," which was separate and apart from "the pattern of racketeering activity," in this case. The evidence indicates that there is "a group of individuals who are associated-in-fact." LSA-R.S. 15:1352(B). The group consisted of Chauncey, McGehee, Marcel, Tonya Sarrio and Roy Sarrio. Roy Sarrio was the management head of the group. In this capacity, he procured the drugs to be sold, set the price, set the quantity and manner of sale, received the proceeds, procured and paid the participants. As functioning elements of the enterprise, Chauncey was a courier, McGehee was a facilitator, Marcel was the "front man" and Tonya was the storage person. These individuals received direction from and participated with Sarrio and, in turn, received payment from Sarrio.
Under these circumstances, the state proved the existence of an "enterprise" as well as the defendant's control and participation in the enterprise. LSA-R.S. 15:1353(B) and (C); 15:1352(B).
Additionally, the state proved the "racketeering activity" which was commission of the crime of distribution of marijuana. LSA-R.S. 15:1352(A)(11); 40:966(A). This element of the crime was proven by the testimony of Officer Bruce Harrison, his surveillance team and the principals who testified for the State.
Finally, the state proved "the pattern of racketeering activity" within the *228 requisite statutory time limit. LSA-R.S. 15:1352(C). That is, the state proved, on May 24, 1996 and May 28, 1996, that Roy Sarrio sold marijuana to undercover agent Bruce Harrison.
On May 24, 1996, Sarrio supplied Marcel with a large quantity of marijuana, which he kept in an ice chest under his house. The marijuana subsequently was used as the source of a one-pound sale to Officer Harrison for the sum of $1600. Marcel gave the money to Sarrio.
On May 28, 1996, Sarrio supplied three pounds of marijuana for sale to Officer Harrison. Officer Harrison gave $1,200 to Marcel and he saw Marcel deliver the money to Sarrio. The drugs were delivered from Sarrio to Marcel, after Marcel had been picked up by McGehee and was brought to Sarrio. Marcel later met with Officer Harrison at Marcel's house and the drugs were delivered to Officer Harrison. Some of this money was recovered at Tonya Sarrio's house that night.
At trial, Roy Sarrio disavowed participation in drug racketeering and in any act of distribution of drugs. This testimony was in contrast with that of the undercover officers and the former principals of the operation. When faced with the conflict, the jury chose to believe the state's witnesses and disbelieve the defendant. This is a credibility determination that rests with the factfinder, which, in this case was the jury, and it will not be overturned on appeal. State v. Silman, supra.
Based on the foregoing discussion, we find that the state has proven, beyond a reasonable doubt, the essential elements of the crime of drug racketeering and also the essential elements of the crime of distribution of marijuana. LSA-R.S.15:1353(B) and (C); 40:966(A). Defendant's claim of insufficient evidence lack merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
In his final assigned error, defendant requests that we review the record for errors patent pursuant to LSA-C.Cr.P. art. 920. Our review reveals a sentencing error which requires that the defendant's sentences be vacated and the matter remanded for resentencing.
In the present case, the transcript reveals that the trial judge sentenced defendant as follows:
The defendant was found guilty on March 16, by a jury, of one count of drug racketeering and two counts of possession with intent to distribute marijuana. And prior to that trial the Bill was amended by the District Attorney's Office to reflect that they were seeking prosecution under Revised Statute 40:982, alleging that the defendant was a habitual offender, having two previous convictions.
At this time, Mr. Sarrio, on the charge of drug racketeering, on which you were found guilty, I'm sentencing you to thirty years at hard labor. On the charges of possession with intent to distribute marijuana, on which you were found guilty of two counts, I'm sentencing you to thirty years at hard labor on each count. And I'm ordering these three sentences to run concurrently.
And having been found guilty of being in violation of revised statute 40:982, I hereby sentence you to serve a term at hard labor on that finding of sixty years. And all sentences are to run concurrently.
As evidenced by the sentencing transcript, the trial judge imposed three sentences upon defendant's racketeering and possession with intent to distribute marijuana *229 convictions. He then imposed a separate sentence of sixty years pursuant to the drug enhancement statute, LSA-R.S. 40:982. We find the imposition of this separate sentence to be an error. While the trial judge was authorized to enhance defendant's sentence for possession with intent to distribute marijuana, he was not authorized to impose a separate sentence pursuant to LSA-R.S. 40:982. While this may have been the trial judge's intent, such is not clear from the transcript. The uncertainty of the sentences imposed is further evidenced by the fact that there are four different commitments in the record, none of which are consistent with the transcript. Accordingly, for the reasons set forth herein, we affirm defendant's convictions but vacate the sentences imposed and remand the matter for further proceedings consistent with this opinion.
CONVICTIONS AFFIRMED; SENTENCES VACATED AND MATTER REMANDED.