WHIPPLE, C.J.
*604 The defendant, Armond Duhon, was charged by bill of information with one count of racketeering, a violation of LSA-R.S. 15:1353, two counts of money laundering valued at $20,000.00 or more, but less than $100,000.00, violations of LSA-R.S. 14:230(E)(3),[1] and 221 counts of theft valued at $1,500.00 or more,[2] violations of LSA-R.S. 14:67(B)(1).[3] He pled not guilty on all counts. The defendant filed a motion to waive trial by jury, the trial court granted the motion, and the defendant proceeded to a bench trial. The defendant was found guilty of the responsive offense of theft valued at $500.00 or more, but less than a value of $1,500.00, on counts 31, 516, 570, 600, 638, 656, 657, 660, 665, 669, 675, 676, 687, 690, and 761, violations of LSA-R.S. 14:67(B)(2).[4] He was found guilty as charged on all of the remaining 209 counts. The trial court denied the defendant's motion for a new trial.
On count 1 (racketeering), the defendant was sentenced to twenty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. On count 565 (money laundering), the defendant was sentenced to fifteen years imprisonment at hard labor. On count 754 (money laundering), the defendant was sentenced to twelve years imprisonment at hard labor. On the fifteen aforementioned responsive verdicts to counts of theft valued at $500.00 or more, but less than $1,500.00, the defendant was sentenced to six months in parish jail on each count, to be served concurrently. On the 206 remaining counts of theft, the defendant was sentenced to eight years imprisonment *605 at hard labor, to be served concurrently with the sentences imposed on counts 1, 565 and 754. The defendant was also ordered to pay $2,328,000.00 restitution to the Guarisco family and $200,000.00 to the D.A.'s office for prosecution fees. The trial court denied the defendant's oral motion to reconsider sentence.
The defendant now appeals, briefing the following assignments of error:
1. The trial court erred in conducting a judge trial without having a valid waiver of the right to a jury that met the requirements of [ LSA-C.Cr.P. art.] 780.
2. The trial court erred in allowing the State to sever the co-defendant on the day of trial to thwart the presentation of the defense, and compounded the error by denying the request for a continuance and allowing the State to elect to try [the defendant] first and immediately.
3. The convictions are invalid for all counts of misdemeanor theft plus the counts of felony theft that occurred before November 9, 2012, and one count of money laundering that occurred before November 9, 2010, which prescribed before the bill of information was filed.
4. The trial court erred in allowing the testimony of a purported handwriting expert who had no factual basis for rendering an opinion.
5. The trial court erred in allowing bank records into evidence without the proper foundation and in violation of the right to confrontation.
6. The State failed to prove, beyond a reasonable doubt, that [the defendant] engaged in racketeering, money laundering or theft.
7. The trial court erred in imposing unconstitutionally excessive sentences on the [sixty-three-year-old] first offender and denying his motion to reconsider.
For the following reasons, we reverse and render modified convictions on counts 34, 39, 49, 57, 69, 73, 84, and 89, reverse the convictions on counts 87 and 751, and affirm the remaining convictions. As to the sentences, we reverse the sentences on counts 87 and 751, vacate the sentence on count 1 and remand for resentencing on count 1, and affirm the remaining sentences.
STATEMENT OF FACTS
Detective Travis Trigg of the Morgan City Police Department ("MCPD") began investigating theft complaints after a representative of Capital Management Consultants, Inc. ("CMCI"), a real estate investment and holding company for art galleries and apartment buildings, advised the MCPD of suspicious transactions. At the time of the complaint, Karen Duhon ("Mrs. Duhon") was the bookkeeper and DonnaSue Peveto ("Peveto") was the overseer of art inventory at CMCI. After questioning witnesses regarding the complaint, Detective Trigg executed a search warrant at CMCI, including Mrs. Duhon's office, and at the Duhon residence. In executing the warrants, Detective Trigg seized various financial documents, ledgers, and a large amount of lottery tickets and other gambling related items. Detective Trigg further issued search warrants for casino records, and the bank records of the defendant, Mrs. Duhon, Peveto, and A-B-C Siding Company of Morgan City, Inc. ("A-B-C Siding"), a general contracting corporation owned by the defendant. The search warrants for bank records were specifically issued at MidSouth Bank, Whitney Bank, and Morgan City Bank, requesting records from 1999 through 2010, initially, and thereafter, warrants issued requesting records from *606 2011 through 2014. Detective Trigg further received records from Leah Guarisco McGriff (one of the members of the Guarisco family that owned CMCI) that were recovered from computers at CMCI.
Based on his review of the documents and questioning of witnesses, Detective Trigg noted the following patterns of activity. In multiple instances, the amounts identified by Mrs. Duhon in the bank ledger differed from the amount written on the corresponding checks. Specifically, Detective Trigg noted that Mrs. Duhon would receive checks for around $14,000.00 and $9,500.00 that, under CMCI records, were documented as $1,000.00 or less. Detective Trigg testified that although the defendant was not an employee of CMCI, he and Mrs. Duhon opened a joint checking account at MidSouth Bank and ordered checks that indicated that the account belonged to CMCI. Detective Trigg testified that it was his understanding that Scott Tucker, ("Tucker") the owner of Nelson-Tucker, L.L.C. ("Nelson-Tucker"), secretary and shareholder of CMCI, and president of Hellenic, L.L.C. (a separate Guarisco holding), was authorized to write checks on CMCI's actual bank account. Detective Trigg reviewed W-2 statements filed by Mrs. Duhon and CMCI, signed by Mrs. Duhon, and Mrs. Duhon's bank records from 1999 through 2013. Detective Trigg noted that the income reported on the W-2 forms was far less than the amount of money that was diverted from CMCI to the Duhons.
On July 7, 2010, a check for $50,000.00 was written to Mrs. Duhon out of CMCI's bank account. Further, there was a corresponding deposit of that amount into Mrs. Duhon's personal Whitney Bank account. The following day, July 8, 2010, the defendant purchased a 2010 Toyota Sequoia in his name, and in accordance with the title and registration, with Mrs. Duhon's personal check in the amount of $40,499.50. The Toyota Sequoia was later sold back to Courtesy Toyota for $26,000.00, in the form of a cashier's check made out to the defendant. Three years later, on October 17, 2013, the defendant similarly purchased a 2014 Ford-250 in his name, as indicated by the title and registration, with a check from his A-B-C Siding MidSouth Bank checking account. On the day the check was written, the A-B-C Siding account did not have sufficient funds to cover the check. The following day, October 18, 2013, a MidSouth Bank check for $30,000.00 made payable to "A-B-C Siding Co" was signed by Mrs. Duhon and deposited into the defendant's A-B-C Siding MidSouth Bank checking account. The check bore the following names as the payor: Capital Management Consultants, Inc., Armond Duhon, and Karen Duhon.[5]
In February of 2014, the Guarisco family hired Mark Munson, a certified public accountant (CPA), to conduct a forensic analysis for CMCI. Munson testified at trial as an expert, and as a certified public accountant with an emphasis in audit and reviews and compilations. Munson was initially retained by the Guariscos after Tucker died to prepare the 2013 corporation tax returns. When he attempted to acquire the year-end working trial balance and general ledger, he learned that they were prepared by Tucker and Mrs. Duhon. Along with Laura Guarisco, Munson made several requests to Mrs. Duhon to obtain the information and received excuses in response for up to six weeks. Munson ultimately *607 received a package from Mrs. Duhon, however, it did not contain the necessary financial documents, such as the working trial balance and the general ledger.
In late February to early March of 2014, Munson met with some of the Guarisco siblings in Morgan City, and they searched Mrs. Duhon's office. They found the bank statements, check register, and documentation showing that she took steps to begin the bookkeeping for 2013, but did not actually make any significant progress. Munson took the information back to his office and prepared the books for 2013. He noted that the amount of income that Mrs. Duhon told Laura she was making did not coincide with the records. He stated that in comparing bank statements and check stubs, it became apparent that checks were being written for one amount and clearing the bank for substantially more. He noted that the amount reflected in the check register was often significantly less than the amount that cleared the bank for the corresponding check.
The Guariscos asked Munson to examine the books for previous years to detect other discrepancies, and Munson prepared a written analysis of the checks and the discrepancies, showing how unauthorized funds were concealed. He noted patterns such as Mrs. Duhon writing herself a check and recording it as $1,000.00, but the check clearing for $14,000.00. Such discrepancies appeared for every month for the four years that Munson analyzed, from 2010 to 2013. Munson further noted that there was also a pattern of checks written to Peveto, which normally were written for a smaller amount between $100.00 and $400.00, but would clear for $9,000.00 plus the smaller amount. After completing his analysis, as stated in his report, Munson concluded that checks written to Mrs. Duhon and Peveto during the four-year period that cleared in excess of the amounts recorded on the book of the company were in the amount of $273,100.00 for 2010, $289,500.00 for 2011, $254,000.00 for 2012, and $249,000.00 for 2013. Munson further provided a detailed schedule of each of the understated and overstated checks comprising the stated totals for each year. Munson determined where the excess amount of the checks were recorded on the books by detecting the checks on the books that were recorded for significantly more than they actually cleared the bank. The total excess amount of the checks, which had a higher recording than their clearance amount, equaled the clearance total for the checks written to Mrs. Duhon and Peveto.[6]
Munson further determined that during the same time period, working trial balance documents prepared by Tucker and Mrs. Duhon included journal entries that further concealed the transactions. He testified that in 2010, journal entries were made to write off accounts receivable charged to Tucker in the amount of $123,085.00 and a loan to Mrs. Duhon in the amount of $50,000.00 that was written off as an expense in the books. Additional loans to Mrs. Duhon were written off in 2011 in the amount of $22,000.00. Another tactic of concealing the overstated amounts included recording checks that never cleared the bank. For example, in 2010, the total for recorded checks that did not clear the bank was $273,100.00. Checks written to Mrs. Duhon were traced to a joint bank account with the defendant. The checks were deposited either the same day or the day following the written date reflected *608 on the check. For nearly every month, there was, in addition, a transfer of funds from the joint account (one that includes CMCI's company name) into the A-B-C Siding account.
He examined CMCI banking transactions signed by Mrs. Duhon and checks purportedly signed by Tucker. As to the CMCI-identified checks written on the Duhon account, Munson testified that based on his understanding, CMCI was not on the bank statement itself, although its name was on checks and deposit slips. As he was familiar with Tucker's program and style of preparation, Munson noted that, in his opinion, the working trial balance documents (retrieved from Tucker's computer and a file cabinet at Hellenic) were prepared by Tucker. He concluded that the monthly cash receipts, disbursement journal, and the general ledger trial balance, which were all maintained on Mrs. Duhon's computer, were prepared by Mrs. Duhon. In addition to the electronic items, Mrs. Duhon further kept a manual check register in her office. Munson referred the Guariscos to an accounting firm to conduct a forensic fraud analysis. Subsequently, a forensic analysis conducted by Joan Martin, the CPA retained by the Guariscos, further supported the charges of racketeering, money laundering, and theft in the instant case.
SUFFICIENCY OF THE EVIDENCE
(Assignment of Error No. 6)
In assignment of error number six, the defendant argues that the State's evidence that he was a principal to the instant offenses was wholly insufficient. He argues that he was blinded by his love for his wife and completely relied upon and trusted her regarding business and family operations. The defendant claims that there is a "glaring lack of evidence" of his participation and awareness of what occurred, contending that the crimes are "all about Karen Duhon and her involvement with CMCI, Scott Tucker, and DonnaSue Provato [sic]." The defendant notes that his wife, who he claims had a gambling addiction, controlled what he knew about CMCI, family finances, and A-B-C- Siding, further stating that she performed all of the bookkeeping and banking.
In addition to the claims regarding the lack of evidence that he was a principal to the instant offenses, the defendant raises the following arguments as to the crimes herein. As to the racketeering offense, the defendant contends that the State failed to prove beyond a reasonable doubt that there was a criminal enterprise existing separately from its alleged racketeering activity, that the defendant was a member of the group of individuals comprising the enterprise, or that he knowingly received proceeds. The defendant claims that he did not write, sign, deposit, or endorse any of the checks. He claims that he was not in the CMCI business and had no contact with Peveto or Tucker. The defendant further claims that the alliance between Tucker, Peveto, and Mrs. Duhon existed only for the purpose of fulfilling Tucker's plan for theft and money laundering. As to the counts of money laundering, the defendant contends that the State failed to prove beyond a reasonable doubt and to the exclusion of a reasonable hypothesis of innocence that he conducted the transaction regarding count 565, or that he knew the proceeds were from a criminal activity as to counts 565 and 754.
Regarding the 221 counts of theft, the defendant argues that the State failed to prove beyond a reasonable doubt and to the exclusion of a reasonable hypothesis of innocence that there was a taking, that all of the checks belonged to another, that the checks were taken without authority or consent, and that the defendant specifically *609 intended to commit theft. The defendant notes that Guarisco signed one of the first checks for $9,980.00 to Mrs. Duhon and Tucker signed the subsequent checks, contending that only Tucker and Mrs. Duhon could give consent or authority for CMCI. As to the group of checks written from the MidSouth Bank joint account to the defendant's A-B-C Siding account, he argues that the State failed to prove that the property involved in those counts belonged to another.[7] The defendant contends that the checks involved in counts 2, 510, 531, and 532 were under the sole control of Mrs. Duhon. He further contends that the State failed to prove a taking as to the checks in counts 6, 11, 13, 17, 20-22, 28, 34-37, 39, 41, 49-62, 64, 65, 67-81, 83, 84, 87, 347, 349, 372, 447, 451, 454, 457, 461, 466, 471, 475, 483, 487, 488, 493, 495, 496, 528, 622, 630, 635, 641, 646, 651, 655, 658, 682, and 711. Finally, as to the checks deposited into his joint account by Mrs. Duhon, regarding counts 65, 352, 354, 364, 366, 369, 378, 381, 386, 389, 393, 397, 401, 408, 411, 414, 417, 420, 427, 430, 435, 440, 498, 502, 503, 505, 508, 509, 511, 517, 526, 528, 534, 539, 607, 619, 648, 663, 668, 673, 680, 686, 693, 694, 700, 705, 708, 714, 718, 720, 722, 725, 727, 731, 733, 736, 739, 742, 747, 750, 760, 766, 770, and 774, the defendant argues that there was no evidence to show that he was aware of the deposits.
When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proven beyond a reasonable doubt. State v. Hearold, 603 So.2d at 734. When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion of trial error issues as to that crime would be pure dicta since those issues are moot. However, when the entirety of the evidence is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the other assignments of error to determine whether the accused is entitled to a new trial. If the reviewing court determines that there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused will be granted a new trial, but is not entitled to an acquittal. See State v. Hearold, 603 So.2d at 734.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821(B) ;
*610 State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. LSA-R.S. 15:438. State v. Wright, 98-0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157 & 2000-0895 (La. 11/17/00), 773 So.2d 732.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. LSA-R.S. 14:24. However, a defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. State v. Neal, 2000-0674 (La. 6/29/01), 796 So.2d 649, 659, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984). Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Marshall, 2004-3139 (La. 11/29/06), 943 So.2d 362, 369, cert denied, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007). It is the trier of fact who weighs the respective credibilities of the witnesses, and this court generally will not second-guess those determinations. See State v. Hughes, 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051.
Racketeering
The Louisiana Racketeering Act is contained in LSA-R.S. 15:1351 -56. The activities prohibited by the act are set forth in LSA-R.S. 15:1353, and provide in pertinent part, as follows:
B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property.
C. It is unlawful for any person employed by, or associated with, any enterprise knowingly to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.
In pertinent part, "racketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit money laundering (later defined herein), a crime that is punishable under LSA-R.S. 14:230. See LSA-R.S. 15:1352(A)(17). An "[e]nterprise" is defined as "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." LSA-R.S. 15:1352(B). The term "[p]attern of racketeering activity" means "engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992 and that the last of such *611 incidents occurs within five years after a prior incident of racketeering activity." LSA-R.S. 15:1352(C).
We note that there is limited jurisprudence regarding the Louisiana Racketeering Act. In State v. Touchet, 99-1416 (La. App. 3rd Cir. 4/5/00), 759 So.2d 194, the Louisiana Third Circuit Court of Appeal noted that the Louisiana Drug Racketeering Statutes are modeled after the federal "RICO" legislation. In that regard, the court turned to federal interpretations for guidance in explaining the components of the state statutes. The court, in Touchet, 759 So.2d at 197, stated as follows:
The enterprise is an entity ... a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by participants in the enterprise.... The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.... [quoting United States v. Turkette , 452 U.S. 576, 583, 101 S.Ct. 2524, 2528-29, 69 L.Ed.2d 246, (1981) ].
* * *
[A]n enterprise must be either a legal entity or an association-in-fact. Further, an association-in-fact enterprise must: (1) have an existence separate and apart from the pattern of racketeering, (2) be an ongoing organization, and (3) have members functioning as a continuing unit as shown by a decision-making structure.
[Citations omitted.]
In Touchet, the State presented the "enterprise" as the group of co-defendants organized to transport marijuana. The separate "racketeering activity" consisted of the defendant's acts of selling the marijuana. As the court noted, they were essentially the same activity. Thus, the court found that the drug conspiracy was not an enterprise because the organization's existence was for the sole purpose of engaging in racketeering activity (i.e., distribution of controlled substances). On that basis, the court reversed the racketeering conviction therein. Touchet, 759 So.2d at 199-201.
In State v. Sarrio, 2001-0543 (La. App. 5th Cir. 11/27/01), 803 So.2d 212, 226-29, writ denied, 2002-0358 (La. 2/7/03), 836 So.2d 86, the Louisiana Fifth Circuit Court of Appeal upheld a racketeering conviction, finding that the case was factually distinguishable from Touchet, The court noted in Sarrio that, in addition to the testimony of the undercover officer and his surveillance team, which illustrated the various drug transactions, the testimony of the principals to the operation at issue therein gave insight into the workings of the organization itself. Specifically, William Chauncey was a cab driver who became a courier for the head of the operation, Roy Sarrio. Chauncey, who initially transported people for Sarrio, later transported packages of marijuana for him in return for money. The court found that based on the evidence therein, it was clear that there was an enterprise that was separate and apart from the pattern of racketeering activity. Sarrio, 803 So.2d at 226-27.
In a discussion comparing Touchet and Sarrio, in Johnson v. Cain, 347 Fed. Appx. 89, 91 (5th Cir. 2009), cert. denied, 559 U.S. 995, 130 S.Ct. 1744, 176 L.Ed.2d 218 (2010), the United States Court of Appeals *612 for the Fifth Circuit noted that the Sarrio court seemingly applied a more lenient interpretation of the law. Specifically, the federal court stated, "Although purporting to apply a 'separate and apart' requirement, the Sarrio court as a practical matter found that the State had proven a violation of the statute even though the enterprise existed for no other purpose than drug dealing." Johnson, 347 Fed. Appx. at 92. The court noted that the Louisiana state courts could have interpreted Louisiana's racketeering statute as not requiring that the enterprise have a purpose separate and apart from the racketeering activity. Johnson, 347 Fed. Appx. at 93. In conducting a de novo review of the defendant's sufficiency of the evidence claim, the district court in Johnson found that the evidence presented by the State supported the jury's finding of guilt under either interpretation (the more lenient Sarrio interpretation or the more stringent Touchet interpretation). Johnson, 347 Fed. Appx. at 92. In affirming the judgment of the district court on a petition for a writ of habeas corpus, the federal appellate court found that the evidence introduced at Johnson's trial indisputably met the more lenient interpretation of an "enterprise." Johnson, 347 Fed. Appx. at 92-93. In the instant case, as further detailed herein, we find that the evidence presented by the State supports the trial court's finding of guilt under either interpretation of Louisiana's racketeering statute.
Money Laundering
Louisiana's money laundering statute provides that it is unlawful for any person knowingly to conduct, supervise, or facilitate a financial transaction involving proceeds known to be derived from criminal activity, when the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of proceeds known to be derived from such violation. LSA-R.S. 14:230(B)(1). Under LSA-R.S. 14:230(A)(4), "[p]roceeds" means "funds acquired or derived directly or indirectly from or produced or realized through an act."
Because Louisiana's money laundering statute closely resembles 18 U.S.C. § 1956(a)(1)(B)(i), the federal jurisprudence interpreting the latter statute is highly instructive. State v. Dudley, 2006-1087 (La. App. 1st Cir. 9/19/07), 984 So.2d 11, 24, writ not considered, 2008-1285 (La. 11/20/09), 25 So.3d 783. Under federal law, 18 U.S.C. § 1956(a)(1)(B)(i) criminalizes conduct designed to conceal or disguise the source of proceeds of specified unlawful activity even if the defendant does not conceal his own identity in the process. See United States v. Hall, 434 F.3d 42, 50-51 (1st Cir. 2006). Factors helpful in determining whether a transaction was designed to conceal include: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on the practices of criminals. United States v. Magluta, 418 F.3d 1166, 1176 (11th Cir. 2005), cert. denied, 548 U.S. 903, 126 S.Ct. 2966, 165 L.Ed.2d 949 (2006).
While Louisiana's money laundering statute closely resembles the federal statute, we note that the Louisiana legislature has designated money laundering as a crime of general intent. In contrast, the federal money laundering statute exacts a higher burden of proof by requiring proof that a transaction was conducted with specific intent to promote the carrying on of unlawful activity.
*613 State v. Lemoine, 2015-1120 (La. 5/3/17), 222 So.3d 688, 692 (per curiam).
The Louisiana Supreme Court in Lemoine rejected the notion that the Louisiana money laundering statute is susceptible to the "merger problem[,]" concluding that the statute is not drafted in such a way that the evidence necessary to prove the underlying or primary crime is sufficient to also prove a more serious secondary offense. Lemoine, 222 So.3d at 693. As the court in Lemoine further noted, money launderers often mix the fruit of their crimes with legitimately-acquired assets, assuming detection of the dirty funds will be more difficult as a result. The Louisiana money laundering statute places no burden on the State to trace dirty money after it has been commingled with clean money. The statute only requires the State to prove that dirty money constituted a portion of the commingled funds that were maintained or deployed for a criminal purpose. Lemoine, 222 So.3d at 694-95 (further holding that "even accepting that the evidence in this case showed the dirty money made up less than six percent of the balance of defendant's business account, the [S]tate carried its burden of proof in this regard.").
Theft
Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential. LSA-R.S. 14:67(A). Theft is a specific intent crime. See State v. Bean, 2004-1527 (La. App. 1st Cir. 3/24/05), 899 So.2d 702, 707, writ granted on other grounds, 2005-1106 (La. 3/8/06), 925 So.2d 489, writ denied, 2005-1106 (La. 11/3/06), 940 So.2d 652. Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Henderson, 99-1945 (La. App. 1st Cir. 6/23/00), 762 So.2d 747, 751. writ denied, 2000-2223 (La. 6/15/01), 793 So.2d 1235.
Herein, at trial, Dirk Bergeron, a special agent with the Office of Inspector General for the Social Security Administration, testified that his duties included the investigation of waste, fraud, and abuse of programs related to the Social Security Administration (SSA). Bergeron was previously a special agent with the U.S. Secret Service and employed by the State Police, Bureau of Investigations. Agent Bergeron researched the indices associated with the defendant and Mrs. Duhon, including W-2 and W-3 statements prepared by Mrs. Duhon, wage earning statements, and benefit applications.
The income that Mrs. Duhon reported from CMCI was roughly between $30,000.00 and $40,000.00 from 2000 to 2005, was over $45,000.00 in 2006 and 2007, and was about $43,000.00 for the following three years of 2008 to 2010. However, the income that she reported from CMCI for 2011 was only $5,829.34, significantly lower than the preceding years. In 2012, 2013, 2015, and 2016, Mrs. Duhon did not report any income from CMCI. However, in 2014, she reported earning $4,872.77 from *614 CMCI. Agent Bergeron confirmed that evidence showing that substantially more money flowed from CMCI into the Duhon accounts would indicate underreporting. In 2000, 2001, and 2002, the defendant initially reported $11,083.00 in earnings but amended the returns each year to reflect no earnings. From 2003 to 2006, the defendant again reported $11,083.00 in earnings for each year, but did not amend those returns. From 2007 to 2016, the defendant had no reported income.
Siblings Leah, Laura, Maria, Elizabeth, and Victor, the children of Peter V. Guarisco and shareholders of CMCI, testified at trial. In addition to being a shareholder, Laura Guarisco was the director of CMCI at the time of the trial. The Guariscos confirmed that in addition to being the secretary at CMCI, Tucker's company, Nelson-Tucker, performed accounting work for CMCI. They further confirmed that Mrs. Duhon was a part-time bookkeeping clerk at CMCI. As to Peveto, they confirmed that she kept art inventories for Peter Guarisco's galleries, adding that as an employee of Inglewood Investments, she assisted with Inglewood properties. Sometime after Tucker's death in 2014, the Guarisco family met with accountant Mark Munson, as they began to suspect that fraud and mismanagement of CMCI had occurred. Suspicion initially arose when they were unable to contact Mrs. Duhon to get tax information for CMCI and thereafter realized that Mrs. Duhon lied about her salary.
In gathering records for law enforcement, the Guariscos ultimately noted a $50,000.00 check written in July of 2010 and a $22,000.00 check written on March 18, 2011, from CMCI's Whitney Bank account to Mrs. Duhon. They further found documentation of a corresponding deposit into the Duhon joint account for the same amount. In reviewing documents, Leah and Laura noted a pattern of repeated additions of $9,000.00 to Mrs. Duhon's wages. The same amount, $9,000.00, was added to supply reimbursement checks to Peveto, with her giving one-half, $4,500.00, to Mrs. Duhon. They further noticed a pattern of $14,500.00 checks being written out of CMCI's account to Mrs. Duhon, while a lesser amount was recorded in the check register. Leah confirmed on cross-examination that in her pending lawsuit against Nelson-Tucker, she alleged in her affidavit that Mrs. Duhon and Tucker had an intimate relationship.
Tucker had a five percent minority interest in CMCI, earned a monthly salary from CMCI of $3,000.00 as the CPA, and was an employee supervisor who had limited authority to write checks, but did not have full discretion. In March of 2014, when Laura and Victor questioned Mrs. Duhon as to the amount of her CMCI salary, she stated that she was being paid $8,500.00 a month from the beginning of 2014, and was previously making $15,000.00 annually. After Laura and Victor reviewed up to eight months of bank statements and a working trial balance in 2012, they found that the amount of money that Mrs. Duhon actually made from CMCI was considerably more than the amounts that she reported. Specifically, Mrs. Duhon was receiving between $18,500.00 and $28,000.00 monthly. They further observed that some of the line items on the working trial balance were questionable. Laura and Victor confronted Mrs. Duhon with the discrepancies. Mrs. Duhon indicated that the additional $10,000.00 monthly disbursements were for her retirement, and that she had initially forgotten to mention that to them. Mrs. Duhon further explained that she was being compensated for a consulting fee, in addition to salary payment from the director fee line item. Mrs. Duhon labeled other discrepancies as advances and loans *615 and stated that the insurance line item consisted of a combination of automobile insurance for her vehicle and health insurance. None of these disbursements were authorized by the Guariscos. Further, as previously noted, Mrs. Duhon and the defendant were not authorized to use the CMCI name on a checking account.
Maria Guarisco testified that Tucker, prior to his death in 2014, had signatory authority on her personal account, in order to place payments on her bills on her behalf. Tucker was only authorized to use the account to pay Maria's bills. Maria further surmised that Mrs. Duhon would routinely bring checks to Tucker to sign. Maria ultimately discovered unauthorized checks that were cashed from her personal account that had not been used to pay her bills. For example, checks dated for December 15, 2010, in the amount of $5,943.54, for March 18, 2011, in the amount of $10,342.98, and for April 1, 2011, in the amount of $20,041.32, were paid to an American Express account that belonged to Mrs. Duhon, not Maria. In addition to those checks, several additional checks, up to the date of June 7, 2012, were used to pay Mrs. Duhon's American Express account bills and all of the checks were paid from Maria's account. An authorized check dated April 23, 2012 in the amount of $332,379.62 (purportedly signed by Tucker) paid to CMCI also cleared Maria's account.
Ashley Spivey, a slot analyst at Cypress Bayou Casino Hotel, provided certified casino records for the defendant and Mrs. Duhon to the MCPD, in response to the search warrant. One of the documents showed that the defendant played slot machines for 15,646.82 minutes, a little over 260 hours, during the recorded time period, and a total amount of $672,962.26 was waged based on his player's card. During the same time period, on overlapping dates, Mrs. Duhon played slot machines for 19,719.53 minutes and wagered $1,053,691.06. She stated that the defendant executed a handwritten note allowing his wife, Mrs. Duhon, to sign checks on his MidSouth Bank account (account number 500706802). The account was associated with the defendant, as well as CMCI. Spivey specifically noted that the checks cashed at the casino under the above account number, were initially listed as "Armond Duhon, MidSouth Bank," and were subsequently presented as CMCI checks under the same account number and bank. She noted that both the defendant and Mrs. Duhon cashed checks on the defendant's account and on the A-B-C Siding account as well at the casino.
Dean Duplantis, the general manager and vice president of Hellenic at the time of the trial, testified that he worked in the same office area as Mrs. Duhon when she worked for CMCI, and that he had hired A-B-C Siding to perform various general contracting jobs in the past. The defendant called Duplantis the day that MCPD were searching Mrs. Duhon's office. The defendant specifically inquired about bidding on a convenience store on property that Duplantis had future plans of purchasing. After Duplantis informed the defendant that the purchase would take place far in the future, the defendant inquired about Mrs. Duhon possibly working for Duplantis, stating in part, "[t]he money stopped." The defendant further stated, "I wish I knew who threw Karen under the bus. I'd take them out with my AK-47." Duplantis informed the defendant that he did not need any assistance. From 2006 to 2014, on behalf of Mrs. Duhon, Reva Fromenthal, the Risk Manager for Hellenic, routinely deposited CMCI checks at Whitney Bank and returned with an envelope for Mrs. Duhon. Fromenthal testified that she was not aware of the content of the envelopes, but assumed that they contained cash. She *616 did not know the number of deposits that she made for Mrs. Duhon.
Steven G. Drexler testified as an expert in forensic document examination and handwriting analysis. The handwriting comparison procedure involves an examination for such things as natural rhythm and speed, unusual pen stops or lifts, and the heaviness or thickness of the writing. Drexler testified that he compared known exemplars of the defendant and Mrs. Duhon to other documents and prepared a report. He concluded that all of the documents submitted for comparison to the defendant's known exemplar were written by the defendant.[8] He further concluded that all of the documents submitted for comparison to Mrs. Duhon's known exemplar were written by Mrs. Duhon.
Joan Martin, the CPA retained by the Guarisco family to conduct a forensic analysis of CMCI, testified at trial as an expert in forensic accounting and as a certified public accountant. Martin reviewed originals and copies of cancelled checks, deposit slips, bank statement, general ledgers, trial balances, cash journals, payroll records, W-2s, social security records, and other documents generated in the course of business. The duration for the documentation reviewed was from 1999 to 2013. Consistent with Munson, Martin found that large sums of money were moved out of CMCI's account into the possession of Mrs. Duhon and the defendant's joint account.
Specifically, the majority of the funds were deposited into what Martin referred to as a "fake" CMCI account, which was owned by Mrs. Duhon and the defendant, but used CMCI's name on checks and deposit slips.[9] After being placed into the joint account, the funds would then be funneled into individual accounts, such as the account for A-B-C Siding, owned by the defendant. Regarding $9,000.00 CMCI payments made to Peveto, Martin testified that one-half of those payments was routinely funneled into the Duhons' personal accounts. She noted that the books were intentionally kept so that the payments were spread out and disbursed. Martin further noted the pattern of Mrs. Duhon's salary checks being increased such that if she had a net payment of $985.00, $9,985.00 would clear CMCI's bank account. Martin produced a diagram showing the patterns of the suspicious activities and the flow of CMCI monies going to the defendant and other entities. Martin was unable to find any evidence that any of the funneled sums were paid back to CMCI.
Martin testified that not long after Tucker's death, the investigation into the CMCI books and records began, and Mrs. Duhon was subsequently terminated. Within a couple of weeks of Mrs. Duhon's termination, the fake CMCI account began to be cleared out. A check made out to cash for $20,000.00 was taken from the fake CMCI account, deposited into A-B-C Siding, and then went into a new account that was opened at MidSouth Bank under *617 the defendant's name as the sole signer. Martin further testified that a total $1,613,553.26 was diverted from CMCI's actual bank account to the joint account of the defendant and Mrs. Duhon during the time period that she reviewed. She further traced a total amount of $181,350.00 that was diverted from the Duhon joint bank account to the defendant's A-B-C Siding account.
As to the counts of theft, the documentation shows that between January of 1999 and March of 2014, nearly all of a total number of 221 checks were either funneled into the defendant's MidSouth Bank joint account with Mrs. Duhon, or made payable to A-B-C Siding and deposited into the defendant's business account. Many of the checks made payable to Mrs. Duhon cleared CMCI's Whitney Bank account for the amount shown on the check, but were recorded in the check list for a substantially lower amount. In other cases the checks were coded to unauthorized expense such as travel, or left off of the register entirely. Thus, the transactions were concealed in the CMCI books and records. Further, the amounts were not reported as compensation to Mrs. Duhon.
Specifically, as to counts 2, 6, 11, 13, 17, 20-25, 28, 33, 35-37, 41, 50-53, 55, 56, 58-62, 64, 65, 67, 68, and 70, the documentation shows that between January of 1999 and May of 2001, CMCI's checks made payable to Karen Duhon for $9,800.00 cleared CMCI's Whitney Bank account for that amount, but were recorded in the check list for $800.00 each. As to each check, $9,800.00 was deposited into the Duhon joint bank account at Iberia Bank. The remaining checks in that sequence, on counts 26, 31, 34, 39, 49, 54, 57, and 69, were made payable to Mrs. Duhon in amounts ranging from $500.00 to $2,500.00, cleared CMCI's account, and were deposited into the joint account of the defendant and Mrs. Duhon for the corresponding amounts. Martin determined that the monies were funneled into the Duhon joint account and utilized by both the defendant and Mrs. Duhon, noting that both the defendant and Mrs. Duhon wrote checks from the joint account.
From June of 2001 to November of 2001, the defendant and Mrs. Duhon began funneling deposits into their joint account from CMCI's checks, made payable to Mrs. Duhon for $9,935.00 (counts 71, 72, 74-81, and 83). Other checks during roughly the same time period on counts 73, 84, and 89 were made payable to Mrs. Duhon in amounts ranging from $500.00 to $2,500.00, cleared CMCI's account, and were deposited into the joint account of the defendant and Mrs. Duhon for the corresponding amounts. The transactions were concealed in the CMCI books and records. Thus, in some cases the check stub was not recorded in the correct amount, and in other cases the checks were coded to an incorrect or fictitious amount in the cash register or left off of the register entirely. Moreover, the amounts were not reported as compensation to Mrs. Duhon.
However, we note that as to count 87, although the CMCI check was made payable to Mrs. Duhon, there is nothing in the record to indicate that the funds were deposited into either the joint account of the defendant and Mrs. Duhon or the defendant's A-B-C Siding account.
Between early 2002 and 2006, several checks, on counts not charged against the defendant in the instant case, were deposited into Mrs. Duhon's separate bank account. From December of 2006 to January 2008, the defendant and Mrs. Duhon began tunneling deposits into their joint account at MidSouth Bank (referenced as the fake CMCI account) from CMCI's checks made payable to Mrs. Duhon for $9,985.00 each *618 (counts 347, 352, 354, 358, 364, 366, 369, 374, 378, 381, 386, 389, 393, 397, 401, 403, 408, 411, 414, 417, 420, 427, 430, 435, 440, and 447). Each check was recorded in the CMCI books and records as $985.00, but cleared CMCI's account for $9,985.00 each. Other checks during roughly the same time period (counts 349, 372, and 442), were made payable to Mrs. Duhon for $5,000.00, cleared CMCI's account, and were deposited into the Duhon joint account for the corresponding amounts. In amounts ranging from $1,800.00 to $5,000.00 (counts 360, 362, 379, and 382), checks from the fake CMCI MidSouth Bank joint account were made payable to A-B-C Siding and deposited into the A-B-C Siding bank account. As to funds that were moved from the joint, fake CMCI MidSouth Bank account to the defendant's A-B-C Siding business account, Martin testified that she determined that the funds were derived from CMCI and that the transactions were configured to conceal the source of the funds. The $5,000.00 checks on counts 372 and 442 were coded to unauthorized expense accounts such as travel; the other amounts were improperly recorded in order to misrepresent the use of the funds.
From January of 2008 to November of 2009, the defendant and Mrs. Duhon began funneling deposits into their joint account from CMCI's checks made payable to Mrs. Duhon for $4,000.00 (counts 451, 454, 457, 461, 466, 471, 475, 483, 487, 488, 493, 495, 498, 502, 503, 505, 508, 509, 511, 517, 521, and 528) and $9,000.00 (count 525). During that time period, four checks from the fake CMCI MidSouth Bank joint account were made payable to A-B-C-Siding for $4,000.00, $2,000.00, $1,000.00, and $6,000.00 (counts 506, 510, 516, and 527), and one CMCI check made payable to Mrs. Duhon for $10,000.00 (count 496) cleared CMCI's account and was deposited into the defendant and Mrs. Duhon's joint account. The remaining offenses that took place in 2009 (counts 531-34) involve checks made payable to Mrs. Duhon from CMCI or to A-B-C Siding from the fake CMCI account in amounts ranging from $7,000.00 to $14,000.00. Check stubs in CMCI's corporate records show that checks were being recorded for an amount that was much less than the actual amounts for which checks were written.
The same pattern occurred throughout 2010 to May of 2012. Specifically, 2010 involved ten CMCI checks in the amount of $14,500.00, one check for $14,000.00, nine additional checks ranging from $2,000.00 to $6,000.00 (counts 535, 537, 538, 543, 544, 548, 549, 551, 555, 556, 560, 561, 563, 568, 571, 572, 577, 582, 584, 589), and one check for $1,000.00 (count 570). The checks valued at $14,000.00 or more were recorded as though the checks were made for $1,000.00. As to counts 593, 596, 602, 603, 607, 611, 613, 617-19, 622, 623, 630, 632, 635, 641, 646, 648, 651, 655, 658, 659, and 661, the year 2011 involved eleven checks in the amount of $14,000.00, one check for $15,000.00, and eleven additional checks ranging from $1,500.00 to $9,683.00. This included at least one check per month. Also in 2011, five additional checks from the fake CMCI MidSouth Bank joint account were made payable to A-B-C Siding for $1,000.00 or less (counts 600, 638, 656, 657, and 660). In 2012, checks made payable to Mrs. Duhon or A-B-C Siding included twelve checks for $14,000.00, one check for $15,000.00, and six checks ranging from $2,000.00 to $9,983.00 (counts 663, 668, 673, 680, 682, 684, 686, 693, 694, 700, 701, 705, 706, 708, 711, 712, 714, 718, and 720). Nearly one check was written every month. That year, six additional checks at issue were made payable to A-B-C Siding from the fake CMCI account for $1,000.00 (counts 665, 669, 675, 676, 687, and 690).
*619 In 2013, the final full year, additional checks made payable to Mrs. Duhon or A-B-C Siding were determined by Martin to consist of unauthorized funds derived from CMCI. The unauthorized checks consisted of twelve checks in the amount of $14,000.00, one check for $30,000.00, and four checks ranging from $2,000.00 to $9,943.00 (counts 722, 723, 725, 727, 728, 731, 733, 736, 739, 742, 747, 750, 753, 755, 757, 760, and 764). One additional check in 2013 was made payable to A-B-C Siding from the fake CMCI account for $1,000.00 (count 761). However, as to count 751, a CMCI check was made payable to Peveto for $9,224.72 and deposited into Peveto's personal checking account. Thus, as previously noted in regard to count 87, on count 751, there is nothing in the record to indicate that the funds were deposited into the defendant and Mrs. Duhon's joint account or the defendant's A-B-C Siding account. From January to March of 2014, seven additional checks were made payable to Mrs. Duhon from CMCI or to A-B-C Siding from the fake CMCI MidSouth Bank account, including three checks in the amount of $14,000.00, one check for $20,000.00, and three checks for $5,000.00 (counts 766, 768, 770-72, 774, and 775).
In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied. 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Further, the testimony of the victim alone is sufficient to prove the elements of the offense. State v. Dickerson, 2016-1336 (La. App. 1st Cir. 4/12/17), 218 So.3d 633, 640, writ denied. 2017-1147 (La. 8/31/18), 251 So.3d 1062.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984). Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Marshall, 943 So.2d at 369. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932.
Herein, as the trier of fact, the judge could have reasonably concluded that the State proved the existence of a separate enterprise for the purposes of racketeering. Mrs. Duhon was a CMCI employee, hired to handle bookkeeping. Although the defendant did not have direct access to CMCI funds, the evidence showed that he had joint control of the bank account used to funnel the funds for unauthorized, non-company personal use. The trier of fact could have reasonably concluded that the evidence showed a significantly large number of acts of racketeering committed by the participants in the enterprise, including the defendant. The evidence further showed that the defendant commingled proceeds from legal transactions with the proceeds from the illegal transactions. Specifically, funds were further transferred into the defendant's business account purportedly set up to deposit other funds gained through his general contracting incorporation.
Regarding the two convictions of money laundering, we find that the trial judge could have reasonably concluded that the State proved that the defendant was a principal to Mrs. Duhon's actions in conducting and facilitating financial transactions *620 involving proceeds derived from CMCI in an unauthorized manner, designed to conceal the purpose or true use of the proceeds. The evidence shows that the defendant used portions of the funneled funds to purchase two vehicles in this case. In addition to testimony by Martin indicating that she was able to trace the funds used to purchase the vehicles to unauthorized, concealed transactions involving CMCI funds, the State further introduced statements by the defendant that were probative of his intent, and (on count 754) evidence that the funds were deposited into the bank account of a legitimate business.
As to the 221 counts of theft, the evidence on the bulk of the counts showed that the defendant participated in the misappropriation or taking of funds which belonged to another, CMCI, without the consent of the other to the misappropriation or taking, by means of fraudulent conduct, practices, and representations. Regarding the bank accounts used to transfer the CMCI funds that were taken through a pattern of hidden transactions, spanning over a long time period, the defendant was the joint owner of the personal bank accounts, and the owner of the business account. There was no evidence that these funds were returned to CMCI.
In reviewing the evidence, as to the racketeering conviction on count one, the money laundering convictions on counts 565 and 754, and the bulk of the theft convictions, we cannot say that the judge's determination was irrational under the facts and circumstances presented. See Ordodi, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 2014-2295 (La. 1/27/16), 269 So.3d 698, 700-01, 2016 WL 314814, *2 (per curiam). Based on our careful review of the record, we are convinced that any rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the offenses of racketeering, money laundering, and theft.
However, the record does not support the theft convictions on counts 34, 39, 49, 57, 69, 73, 84, 87, 89, and 751. Specifically, the trial court failed to reduce the following additional counts for which the evidence did not support a conviction of theft valued at $1,500.00 or more, but instead supported convictions of theft valued at $500.00 or more: counts 34, 39, 49, 57, 69, 73, 84, and 89 (each consisting of a $500.00 check). At the time of those eight counts of theft (between January 5, 1999, and January 4, 2002), this grade of theft (valued at $500.00 or more) was a legislatively authorized verdict to a charge of theft. LSA-R.S. 14:67(B)(1) (prior to revision by 2010 La. Acts No. 585, § 1); LSA-C.Cr.P. art. 814(A)(26) (prior to revision by 2018 La. Acts No. 680, § 1 & 2014 La. Acts No. 255, § 2). Under these circumstances, a reviewing court, pursuant to LSA-C.Cr.P. art. 821(E), may modify the lower court's decision and render a responsive judgment of conviction. See LSA-R.S. 14:5 ; see also State v. Schenck, 513 So.2d 1159, 1165 (La. 1987) ;
*621 State v. Leblanc, 506 So.2d 1197, 1201 (La. 1987) ; State v. Millien, 2002-1006 (La. App. 1st Cir. 2/14/03), 845 So.2d 506, 512. Accordingly, we reverse and render modified convictions on counts 34, 39, 49, 57, 69, 73, 84, and 89, to theft valued at $500.00 or more.[10] As previously noted, on counts 87 and 751, there is nothing in the record before us to indicate that the funds were deposited into an account of which the defendant had joint or sole control such that the defendant committed or was concerned in the commission of the thefts on those two counts. Accordingly, we are constrained to reverse the convictions and sentences on counts 87 and 751. We find no further merit in assignment of error number six.
JURY TRIAL WAIVER
(Assignment of Error No. 1)
In assignment of error number one, the defendant notes that his trial counsel filed a motion to waive the jury that was set for a hearing on March 13, 2017. The defendant contends that the hearing scheduled for March 13, 2017, did not take place. He further contends that there is no minute entry or transcript in the record to show that the trial court determined that he made a knowing and voluntary waiver of his right to trial by jury or that his attorney fully discussed the advantages and disadvantages with him before a decision was made. The defendant argues that LSA-C.Cr.P. art. 780 mandates a discussion between the defendant and counsel commemorated in writing and a written waiver. The defendant argues that in this case, there is no indication in the record that he knew his attorney filed the motion to waive a jury trial. He notes that he did not sign the motion and contends that he was not served with it. Thus, the defendant argues that nothing in the record indicates compliance with Article 780 or a valid waiver. The defendant argues that there is insufficient proof that he knowingly and intelligently waived his right to a trial by jury. The defendant relies on State v. Page, 541 So.2d 409 (La. App. 4th Cir. 1989), writ denied , 548 So.2d 323 (La. 1989) (wherein the court reversed the conviction due to the lack of a personal waiver despite the defense attorney's indication on the record that a jury trial was waived) and State v. Bryant, 2006-1154 (La. App. 4th Cir. 1/10/07), 950 So.2d 37 (wherein the trial court was not required to personally inform the defendant of his right to a jury trial when the transcript revealed that defendant's counsel informed the trial court that defendant wished to waive the jury and proceed to trial by judge and that the trial court addressed the defendant personally and the defendant confirmed that he wished to go to trial by judge rather than by jury trial).
In a footnote, the defendant cites State v. Spurlock, 2013-0068 (La. App. 4th Cir. 11/20/13), 129 So.3d 804, 806-807, wherein a written waiver was filed by counsel, but there was no indication the defendant himself was advised of and knowingly waived his right to a jury trial. The Fourth Circuit Court of Appeal remanded the matter for an evidentiary hearing, after which the trial court determined that the defendant did not knowingly waive his right to a jury trial. However, the Louisiana Supreme Court granted the State's writ and reversed *622 the trial court's finding. The Louisiana Supreme Court held:
In these proceedings, the defendant was aware prior to the instant criminal charges of his due process entitlements as they related to a choice to have his guilt or innocence determined by a judge or a jury of his peers. Among other criminal matters, the defendant has past experience as an accused in the trial of a criminal prosecution where he was found guilty by a jury. In the instant case, the trial record and defense counsel's hearing testimony, which was not found to lack credibility, reflect defense counsel, after consulting with the defendant, waived the defendant's right to a jury trial in open court in the presence of the defendant. Weeks later, the defendant proceeded to a bench trial without raising an objection to the absence of a jury. Under the given facts, the defendant's waiver of a jury trial was knowing and intelligent, [citation omitted]
State v. Spurlock, 2015-1173 (La. 9/25/15), 175 So.3d 955, 955-56. In an attempt to distinguish the instant case from Spurlock, the defendant notes that there was never an on-the-record discussion in the instant case, and further claims that prior to this case, he had rarely been in a courtroom and had never gone to trial.
The punishment for racketeering is a fine, imprisonment at hard labor, or both. LSA-R.S. 15:1354(A). The punishment for money laundering if the value of the funds is $20,000.00 or more but less than $100,000.00 is imprisonment at hard labor and a possible fine. LSA-R.S. 14:230(E)(3). The punishment for theft when the misappropriation or taking amounts to a value of $1,500.00 or more is imprisonment with or without hard labor. LSA-R.S. 14:67(B)(1) (prior to revision by 2014 La. Acts No. 255, § 1; 2017 La. Acts No. 281, § 1; and 2018 La. Acts No. 303, § 1). Thus, the defendant was entitled to a jury trial on the charges in this case. See La. Const. art. I, §§ 16, 17 ; LSA-C.Cr.P. art. 782(A).
The right to trial by jury in felony and certain misdemeanor cases is protected by both the federal and state constitutions. See U.S. Const. amend. VI ; La. Const. art. I, §§ 16, 17. Except in capital cases, a defendant may knowingly and intelligently waive his right to a trial by jury, but no later than forty-five days prior to the trial date, and the waiver shall be irrevocable. La. Const. art. I, § 17 (A); see also LSA-C.Cr.P. art. 780(A). A waiver of trial by jury is valid only if the defendant acted voluntarily and knowingly. See LSA-C.Cr.P. art. 780(A) ; State v. Kahey, 436 So.2d 475, 486 (La. 1983). A waiver of this right is never presumed. State v. Brooks, 2001-1138 (La. App. 1st Cir. 3/28/02), 814 So.2d 72, 76, writ denied, 2002-1215 (La. 11/22/02), 829 So.2d 1037. Accordingly, if a defendant is tried and convicted by a judge when he is entitled to a trial by jury, the record must show that a jury trial was knowingly and intelligently waived. See State v. Cappel, 525 So.2d 335, 336-37 (La. App. 1st Cir.), writ denied, 531 So.2d 468 (La. 1988).
Determining whether the defendant's jury trial waiver is knowing and intelligent does not require a Boykin-like colloquy. State v. Young, 2016-0358 (La. App. 4th Cir. 10/5/16), 203 So.3d 351, 359, writ denied, 2016-1961 (La. 9/06/17), 224 So.3d 988 ; See also State v. Coleman, 2009-1388 (La. App. 1st Cir. 2/12/10), 35 So.3d 1096, 1098, writ denied, 2010-0894 (La. 4/29/11), 62 So.3d 103. Prior to accepting a waiver, the trial court is not obligated to conduct a personal colloquy inquiring into the defendant's educational background, literacy, and work history. State v. Allen, 2005-1622 (La. App. 1st Cir. 3/29/06), 934 So.2d 146, 154.
*623 Although it is the preferred method for the trial court to advise the defendant of the right to trial by jury in open court before obtaining a waiver, such practice is not statutorily required. In addition, although preferred, it is not necessary for the defendant to waive the jury trial right personally. Defense counsel may waive the defendant's right to a jury trial on his behalf as long as the defendant's decision to do so was made knowingly and intelligently. Spurlock, 175 So.3d at 955-56 ; State v. McCloud, 2004-1112 (La. App. 5th Cir. 3/29/05), 901 So.2d 498, 503, writ denied, 2005-1450 (La. 1/13/06), 920 So.2d 235. Moreover, even where there is a lack of full compliance with Article 780, the defendant's conviction will not be reversed absent a showing of prejudice. See Cappel, 525 So.2d at 336. When the record does not clearly indicate a valid waiver of the right to a jury trial, the trend has not been to reverse, but to remand the case to the trial court for an evidentiary hearing on the issue of whether a valid jury waiver was obtained. See State v. Nanlal, 97-0786 (La. 9/26/97), 701 So.2d 963-964.
We note that prior to the arraignment in this case, Article 780 was amended by 2013 La. Acts No. 343, § 1, to remove the requirement that the trial court, at the time of the arraignment, inform the defendant of his right to waive trial by jury.[11] As amended, Louisiana Code of Criminal Procedure article 780 specifically provides:
A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by the judge.
B. The defendant shall exercise his right to waive trial by jury in accordance with Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. The motion shall be signed by the defendant and shall also be signed by defendant's counsel unless the defendant has waived his right to counsel.
C. With the consent of the district attorney the defendant may waive trial by jury within forty-five days prior to the commencement of trial.
D. A waiver of trial by jury is irrevocable and cannot be withdrawn by the defendant.
We further note that in applying the amended version of LSA-C.Cr.P. art. 780(B), the jurisprudence has not held that a valid waiver of the right to trial by jury can only be accomplished through the filing of a written motion signed by both the defendant and his counsel. See Spurlock, 175 So.3d at 955-56 ; Young, 203 So.3d at 358-59 ; State v. Brundy, 2016-0263, 2015-1233 (La. App. 4th Cir. 8/24/16), 198 So.3d 1247, 1262, writ denied, 2016-1748 (La. 6/16/17), 220 So.3d 755.
*624 Herein, the State notes in its brief that at the re-arraignment on the third amended bill of information, the defendant was advised of his right to a trial by jury and preserved that right. The re-arraignment referenced by the State took place on November 9, 2016, prior to the severance of the defendants, and the defendant herein was present in court. The minute entry states that the defendant's counsel entered a plea of not guilty and requested a jury trial on behalf of the defendant. The transcript reflects that at the outset of the proceeding, the State informed the trial court of the third amended bill of information. As the trial court first requested the plea of Nelson-Tucker, the defense attorney present on behalf of the limited liability company stated, "We would enter a plea of not guilty to all counts and reserve our right to a jury trial." At that point, the attorney representing the defendant herein stated, "[w]e would waive the formal reading and enter a plea of not guilty, reserve all of Mr. Duhon's rights." Mrs. Duhon, who was present in proper person, confirmed that she wished to plead not guilty on all counts, and the trial court then stated, "[w]e'll reserve her right to a jury trial." The defendant confirmed that he owned A-B-C Siding, and wanted to plead not guilty on behalf of the company, and the trial court set the matter for motions and trial.
On January 24, 2017, the defendant's attorney filed a motion to waive trial by jury. The motion includes the following language:
Edward Jones, attorney for Armond Duhon, Defendant in the above captioned case, upon consideration and consultation together, waives Armond Duhon [sic] right to a trial by jury in this case.
Defendant, Armond Duhon, further states that he fully understands his right to a trial by jury and thus waives right knowingly, voluntarily, and intelligently.
The hearing on the motion was set for March 13, 2017. The minute entry for that date states, "[t]his case was called on the docket. The Court stated for the record that this matter was already taken care of to which Mr. Jones [the attorney representing the defendant] concurred." As noted by the State, the defendant subsequently proceeded to a bench trial in this matter without making an objection as to not being tried by a jury.
After the verdicts, the defendant filed a motion for a new trial arguing, in pertinent part, that the trial court erred when it permitted him to waive his right to a trial by jury. The motion further claims as follows:
The defendant was not completely advised of the consequences of his waiver and the fact that the waiver was irrevocable. The court may have asked the defendant if he wanted a judge trial on the day of the trial and without counsel's guidance he responded affirmatively to judge trial. He was never questioned if he understood and knowingly waived his jury rights.
However, at the subsequent hearing on the motion for new trial, the defense attorney did not raise the issue.[12] Nonetheless, in responding to the defense counsel, the State addressed the written motion for a *625 new trial in its entirety, including the argument challenging the jury trial waiver. Specifically, the prosecutor stated, in pertinent part, as follows:
Going to the second part of his motion, I'm a bit surprised that Mr. Jones has said that the defendant was not completely apprised of his rights in the waiver of a jury trial. We specifically addressed that, you and I and Mr. Jones, in Chambers and in court with regard to whether or not Mr. Duhon was aware of his rights, and it was fully stated that he was and that it was a clear waiver even prior to the jury conference prior to your verdict. I think you addressed that on the record, Judge. So, that's just a misstatement because that was clearly addressed.
Thereafter, the trial court ruled on the issue as follows, "[a]dditionally, the waiver of the jury trial, that was placed on the record. It's already been ruled upon. I'm going to deny the Motion for a New Trial because of that."
Herein, the defense counsel filed a motion to waive jury trial stating that the defendant understood his right to a trial by jury and "knowingly, voluntarily, and intelligently" waived that right. While the defendant did not sign the waiver, we find the missing signature on the motion harmless under the circumstances. See LSA-C.Cr.P. art. 921 ; Spurlock, 175 So.3d at 955-56 ; State v. Cooley, 2015-916 (La. App. 3rd Cir. 4/27/16), 2016 WL 1688460, *10 (unpublished), writ denied, 2016-1024 (La. 9/15/17), 225 So.3d 482 ; Young, 203 So.3d at 358-59 ; State v. Favron, 2014-1393 (La. App. 1st Cir. 3/6/15), 2015 WL 996376, *2 (unpublished). In this case, prior to the filing of the motion to waive trial by jury, at the re-arraignment on the third amended bill of information the defendant's right to a trial by jury was stated in his presence. The defendant did not object to the bench trial nor raise the issue of the waiver until the verdicts were rendered, raising the issue for the first time in a motion for new trial.
The language used in the motion for a new trial does not refute the defense counsel's assertion in the motion to waive trial by jury that he consulted with the defendant regarding his waiver, nor does the motion for new trial challenge the representation, in the motion to waive trial, that the defendant understood his right to a trial by jury. Although the motion for new trial claims the defendant was not guided by counsel or informed that the waiver was irrevocable, the motion specifically states that the defendant "responded affirmatively to judge trial." The motion for new trial further indicates that the trial court "may have asked the defendant if he wanted a judge trial on the day of the trial[.]" Thus, the language in the motion for new trial suggests that the trial judge failed to engage him in a legally sufficient colloquy. As noted above, this argument is reasserted on appeal to distinguish the instant case from Spurlock (along with the defendant's lack of a criminal history). However, as stated above, a Boykin-like colloquy is not necessary. See Young, 203 So.3d at 359.
While the record does not contain an on-the-record colloquy, herein, after the defense counsel filed the motion for new trial on the issue, the defendant was afforded a hearing wherein he declined to raise the issue and did not contest statements by the prosecutor and trial court indicating that there was a knowing and intelligent waiver. We note that although the defendant is classified as a first felony offender, this was not the defendant's first criminal offense and, thus, he had prior experience as an accused in a criminal prosecution.[13] A *626 careful review of the record before us as a whole, including the language of the written motion to waive trial by jury, the March 13, 2017 minute entry indicating that the trial court and defense attorney concurred that the matter had been taken care of, the lack of an objection by the defendant in proceeding to trial by judge, and the uncontroverted assertions by the State and trial court at the hearing on the motion for new trial regarding the defendant's knowing and intelligent waiver of his right to a trial by jury, leads to the rational conclusion that the defendant, with benefit of counsel, voluntarily and intelligently waived his Sixth Amendment right to trial by jury. We find that there is adequate evidence to demonstrate a valid jury trial waiver. See State v. Guilliams, 2011-2246 (La. App. 1st Cir. 6/7/13), 2013 WL 2487087, *3 (unpublished). Thus, assignment of error number one lacks merit.
SEVER/RIGHT TO PRESENT A DEFENSE
(Assignment of Error No. 2)
In assignment of error number two, the defendant argues that he was denied the opportunity to prepare an alternate defense when the trial court allowed the State to sever co-defendant Karen Duhon on the day of the trial and denied his motion to continue. The defendant claims that in a joint trial, Mrs. Duhon would have testified and exculpated him, and he would have followed her lead in cross-examination. The defendant further claims that Mrs. Duhon handled all of the family's business and personal finances, and that only she knew about the CMCI business and about their bank accounts. The defendant notes that while he had a tenth grade education and was dyslexic, Mrs. Duhon was a bookkeeper at CMCI and could explain money transactions. The defendant contends that when the continuance was denied after the severance, he had no opportunity to call or prepare other witnesses. Citing State v. Walland, 555 So.2d 478, 482 (La. App. 4th Cir. 1989), United States v. DiBernardo, 880 F.2d 1216 (11th Cir. 1989), and Taylor v. Singletary, 122 F.3d 1390 (11th Cir. 1997), which are discussed below, the defendant argues the State improperly manipulated the order of trial by trying his case before Mrs. Duhon's case, so as to preclude her from testifying at his trial. The defendant avers that a new trial is warranted, as he was denied the Fifth and Sixth Amendment rights to mount a defense and to present a material witness.
Article V, § 26(B) of the Louisiana Constitution provides that the district attorney controls the administration of criminal prosecutions. Further, LSA-C.Cr.P. art. 61 states that "[s]ubject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Additionally, LSA-C.Cr.P. art. 704 provides that "[j]ointly indicted defendants shall be tried jointly unless: (1) The state elects to try them separately; or (2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance." Article 704 only requires the trial court to conduct a hearing on a motion to sever when the defendant moves for the severance. The granting or denial of a motion for severance rests in the sound *627 discretion of the trial judge and, absent a showing of clear abuse, his ruling will not be reversed. State v. Williams, 416 So.2d 914, 916 (La. 1982).
In DiBernardo, three co-defendants were to be jointly tried. Two of them, DiBernardo and Rothstein, filed motions to sever based on the affidavit of the third defendant, D'Apice, stating that he would provide exculpatory testimony on their behalf at a separate trial. Otherwise, D'Apice would invoke his Fifth Amendment privilege. The motion to sever proposed that D'Apice be tried first. After the government indicated D'Apice's testimony would not be used against him in a subsequent trial, he agreed to testify. DiBernardo, 880 F.2d at 1219. The DiBernardo court granted the motion to sever, but concluded the defendants had no right to determine the order of trials. DiBernardo, 880 F.2d at 1219-1220. The trial of DiBernardo and Rothstein was held first and D'Apice invoked his privilege against self-incrimination. DiBernardo and Rothstein were convicted and moved for a new trial in 1981. However, the district court never ruled on the motion for a new trial. DiBernardo, 880 F.2d at 1220. In 1986, Rothstein (after DiBernardo disappeared) renewed his motion for a new trial and listed the fact that D'Apice was available to testify because he pleaded guilty in 1984. In 1987, the district court granted a new trial to DiBernardo and Rothstein. DiBernardo, 880 F.2d at 1222. The judge noted his prior error by granting the motion to sever D'Apice, but forcing Rothstein and DiBernardo to trial first. The district court further stated that D'Apice's testimony was "material and could very well have resulted in a different verdict on behalf of both Defendants." DiBernardo, 880 F.2d at 1222. The government took an appeal from the order of the district court granting a new trial.
The Eleventh Circuit Court of Appeals considered the untimely motion for a new trial as a petition for habeas corpus relief. DiBernardo, 880 F.2d at 1226. In regard to the motion to sever, the Eleventh Circuit found that the district court did not abuse its discretion in granting the motion in 1981 based upon D'Apice's proposed testimony. DiBernardo, 880 F.2d at 1228
The DiBernardo court recognized that to succeed on such a motion, the movant must demonstrate: (1) a bona fide need for the co-defendant's testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify on his behalf. DiBernardo, 880 F.2d at 1228. The court noted that while the district court had properly granted the motion to sever in 1981, its decision to try DiBernardo and Rothstein prior to D'Apice constituted a de facto denial of the motion. DiBernardo, 880 F.2d at 1229. The court stated that the judge's ruling on the order of trials negated the possibility that D'Apice would testify although the purpose of granting the severance was to allow his exculpatory testimony. The Eleventh Circuit declared, "[a]s to the order of trials, we agree with the district court's 1981 statement that among severed co-defendants, there is no absolute right to be tried in a certain order; each case must be evaluated on its own facts." DiBernardo, 880 F.2d at 1229. Under the facts of that case, the Eleventh Circuit agreed with the district court that it erred in trying DiBernardo and Rothstein first in 1981. In affirming the granting of the new trial, the Eleventh Circuit found that the error was an abuse of the trial court's discretion that denied the appellees a fair trial. DiBernardo, 880 F.2d at 1229.
In Walland, the court of appeal reversed a trial court ruling denying the defendant's request that his co-defendant be tried first *628 so that the co-defendant could testify on his behalf. Walland, 555 So.2d at 483. The defendant and co-defendant were jointly charged with possession of a stolen vehicle. The defendant filed a motion for severance, arguing that the co-defendant wished to testify on his behalf, but that self-incrimination concerns would prevent it if the two were tried together. The motion was supported by an affidavit from the co-defendant stating that he would testify on behalf of the defendant at a separate trial, but that he would not testify at a joint trial due to concern for his own Fifth Amendment rights. The trial court granted the severance based on the affidavit; however, the State proceeded to trial against the defendant first. The defendant objected to the order of trial, arguing that the co-defendant would not testify unless he was tried first. When the trial court denied his objection, the defendant applied for supervisory writs to the court of appeal. Walland, 555 So.2d at 479.
Relying primarily on DiBernardo, the Walland court held that the defendant's constitutional right to present a defense entitled him to a trial following that of his co-defendant. Walland, 555 So.2d at 482. The court reasoned that, once the trial court granted a severance, only one order of trials was "equitably possible" and that the District Attorney's statutory authority to control the prosecution could not supersede the defendant's constitutional right to a fair trial, to present a defense, and to call his witness. Walland, 555 So.2d at 482. The court ordered that the co-defendant's trial be scheduled prior to the defendant's trial. Walland, 555 So.2d at 483.
In Taylor, the Eleventh Circuit Court of Appeals held that the state trial judge, who has discretion to set the order in which the co-defendants will be tried, violated the defendant's Fifth and Sixth Amendment rights in denying his pre-trial request that his co-defendant be tried first. Taylor, 122 F.3d at 1396. The defendant and the co-defendant were charged with first degree murder. Taylor, 122 F.3d at 1391. After the co-defendant's motion for severance was granted, the defendant moved to be tried after the co-defendant, so that the co-defendant could provide exculpatory testimony on his behalf. The defendant supported his motion with an affidavit from the co-defendant, in which the co-defendant stated that he would assert his Fifth Amendment privilege until his trial was completed and that, whether convicted or acquitted, he would testify at the defendant's trial. The affidavit authorized the co-defendant's attorney to make an in camera proffer as to the details of the co-defendant's proposed testimony. The trial court denied the motion. At trial, the defendant called the co-defendant to the stand, but the co-defendant invoked his Fifth Amendment privilege. The defendant was convicted as charged, while the co-defendant was later acquitted at his trial, at which he testified on his own behalf. On appeal in the state courts, the defendant unsuccessfully argued that the trial court had abused its discretion in denying his motion to be tried after his co-defendant and that his right to present material, exculpatory testimony was denied. Taylor, 122 F.3d at 1391-1392.
The Eleventh Circuit affirmed the federal district court's finding that the defendant's constitutional right to present a material witness had been violated, but the appellate court, noting that the district court had applied an incorrect standard, concluded that the error was not harmless. Taylor, 122 F.3d at 1394-1396. Citing DiBernardo and Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970), the Taylor court held that judicial economy in determining the order of trial must yield to the defendant's right to a fair trial. Equating the potential constitutional harm of a particular *629 sequence of trial with the denial of a severance, the court reasoned that the same factors the trial court considers before ruling on a motion for severance are relevant when the defendant seeks a certain order of trial. Taylor, 122 F.3d at 1392-1393. To show an abuse of the trial court's discretion in scheduling the order of trials, the defendant on appeal must prove that he suffered compelling prejudice. Taylor, 122 F.3d at 1393. The court found that the defendant had a bona fide need for the co-defendant's testimony, that the substance, nature, and effect of the testimony favored granting the motion, and that it was very likely the co-defendant would have testified on the defendant's behalf. The court concluded that the trial court had abused its discretion in denying the defendant's motion because the exclusion of the co-defendant's testimony had caused the defendant prejudice. Taylor, 122 F.3d at 1395-1396. The Taylor court, after reviewing the trial testimony in light of the co-defendant's testimony at his trial, went on to conclude that the trial court's error was not harmless because the defendant had established that the unavailable evidence " 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " Taylor, 122 F.3d at 1395 (quoting Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) ).
The instant case is distinguishable from Walland, Taylor, and DiBernardo. In Walland and DiBernardo, the defendants moved for severance prior to trial requesting that a co-defendant, who was willing to provide material, exculpatory evidence, be tried first. Furthermore, the defendants in those cases, as did the defendant in Taylor, objected to the order of trial when the trial courts did not agree to try first the co-defendants who were willing to provide exculpatory evidence. Here, the defendant did not move for a severance prior to trial; to the contrary, the State elected to sever the defendants pursuant to LSA-C.Cr.P. arts. 61 and 704. More importantly, in contrast to Walland, Taylor, and DiBernardo, the instant defendant failed to provide an affidavit from the co-defendant, stating her willingness to testify on the defendant's behalf and delineating the facts to which she would testify. See State v. Adamo, 97-80 (La. App. 5th Cir. 10/28/97), 702 So.2d 1, 4-5.
In State v. Lawrence, 40,278 (La. App. 2d Cir. 3/15/06), 925 So.2d 727, 741, the defendant argued that the State's decision to sever his trial from that of a co-defendant denied him the right to a fair trial and due process. In considering the defendant's claim, the court found no error in the State's action in light of LSA-C.Cr.P. art. 704 specifically allowing the State to sever the trials of jointly indicted defendants and LSA-C.Cr.P. art. 61. State v. Lawrence, 925 So.2d at 741. Herein, although the defendant objected to the severance, the record does not permit us to conclude that the State engaged in misconduct by electing to sever the cases and try the defendant first. Further, the defendant in this case has failed to meet the burden of showing that Mrs. Duhon would have testified on his behalf. Moreover, the defendant has failed to state the substance of any testimony by Mrs. Duhon that would have been presented and would have further had an exculpatory effect. After reviewing the record, we do not find any prejudice to defendant by the granting of the severance. Thus, we find no abuse of discretion. This assignment of error also lacks merit.
PRESCRIPTION
(Assignment of Error No. 3)
In assignment of error number three, the defendant notes that the State *630 had four years to institute prosecution for felony offenses and two years to institute prosecution for misdemeanor offenses. He contends that in this case, the following charges were prescribed: all of the theft offenses that occurred on or before November 1, 2012, the theft offense that occurred on December 13, 2013 (for which he received a responsive verdict of theft of $500.00 or more), and the money laundering offense that occurred on July 8, 2010. Conceding that the issue was not raised at trial, the defendant nonetheless contends that it may be asserted on appeal. Contending that the offenses were not committed by virtue of an office, employment, or fiduciary relationship, the defendant argues that LSA-C.Cr.P. art. 573, which extends the commencement of the prescriptive period until the relationship or status involved has ceased to exist, is inapplicable in this case. In that regard, the defendant notes that he was not an employee of CMCI and claims that he had no authority over its money or business. Citing State v. Brumfield, 2011- 1599 (La. App. 4th Cir. 11/29/12), 104 So.3d 701, 709-710, writ denied, 2012- 2764 (La. 5/31/13), 118 So.3d 389, and State v. Aucoin, 457 So.2d 885, 886 (La. App. 3rd Cir. 1984), the defendant further contends that he did not have a fiduciary relationship with CMCI or the Guarisco family. Thus, the defendant argues that the time limitation on the offenses herein commenced to run on the date that the money was tendered, when the taking of the property occurred.
Pursuant to LSA-C.Cr.P. art. 572(A)(2), "no person shall be prosecuted, tried, or punished for an offense not punishable by death or life imprisonment, unless the prosecution is instituted" within four years for a felony not necessarily punishable by imprisonment at hard labor. Although the State need not allege facts showing that the time limitation has not expired, once the issue is raised, the State has the burden of proving that the prosecution was timely instituted. LSA-C.Cr.P. art. 577. According to LSA-C.Cr.P. art. 573(1), the date that determines when the four-year statutory period starts to run is not the date that the money was tendered, but the date that the fiduciary relationship terminated. See e.g. State v. Comadore, 2007-0976 (La. App. 4th Cir. 5/14/08), 984 So.2d 203, 205-206, writ denied, 2008-1639 (La. 4/16/10), 31 So.3d 1056 (time limitations did not begin until defendant employee no longer worked for employer she was accused of defrauding); Turner v. Department of Transportation & Development, 2001-2426 (La. App. 1st Cir. 6/21/02), 822 So.2d 786, 790 (time limitations for charge of theft over $500.00 began to run when defendant employee was terminated by victim employer); State v. Averette, 99-2054 (La. App. 1st Cir. 6/23/00), 764 So.2d 349, 351 (time limitations for theft prosecution of defendant who took money from an investor began to run not when money was tendered, but when fiduciary relationship ceased to exist).
Considering the testimony and evidence presented at trial, we find that the fiduciary relationship at issue ceased to exist in 2014, when Mrs. Duhon was terminated. Although the defendant argues that Article 573 is inapplicable as he did not personally have a fiduciary relationship with the victims, we disagree. The crimes committed in the instant case were facilitated due to the longstanding fiduciary relationship between Mrs. Duhon and the Guariscos. Therefore, the time limitations for institution of prosecution did not begin to run until that longstanding relationship ceased to exist in 2014. See LSA-C.Cr.P. art. 573(1). As the bill of information was filed in 2017, the charges in the instant case did not prescribe as prosecution was timely instituted. Thus, we find no merit in assignment of error number three.
*631 HANDWRITING EXPERT
(Assignment of Error No. 4)
In assignment of error number four, the defendant argues that the trial court erred in allowing Steven Drexler to testify as an expert in forensic document and handwriting examination. Specifically, the defendant claims that there was no factual basis for Drexler's testimony that the questioned documents were written by the defendant. Noting that checks from his joint bank account with Mrs. Duhon were presumed to contain known samples of his handwriting, the defendant contends that the State did not take a handwriting sample from him or Mrs. Duhon. He contends that Mrs. Duhon had unfettered access to the joint bank account, as Mrs. Duhon had the ability to sign his name on the checks. The defendant concludes that the only opinion that Drexler could legitimately give was that the checks and documents bearing the defendant's name were written by the same person. He argues that the error was not harmless in this case, contending that the State offered the testimony to show that the defendant knew about the account and the monies that were deposited in it and withdrawn therefrom and wanted the trier of fact to infer that he was a knowing participant in Mrs. Duhon's alleged activities.
A contemporaneous objection is necessary to preserve the issue for appellate review. LSA-C.Cr.P. art. 841(A) ; LSA-C.E. art. 103(A)(1). Additionally, it is well settled that defense counsel must state the basis for his objection when making it and point out the specific error of the trial court. The grounds of the objection must be sufficiently brought to the attention of the trial court to allow it the opportunity to make the proper ruling and correct any claim of prejudice. A defendant is limited on appeal to grounds for an objection articulated at trial. A new basis for objection cannot be raised for the first time on appeal. State v. Brown, 481 So.2d 679, 686-87 (La. App. 1st Cir. 1985), writ denied, 486 So.2d 747 (La. 1986). Herein, the defendant objected to Drexler's testimony solely on the basis of hearsay in regard to the parts of his report that included personal checking account information, which the defendant argued included hearsay. The defendant did not object to the State calling Drexler or to his acceptance as an expert witness or methods of comparison. Instead, the defendant is raising an issue as to the authenticity of the known samples for the first time on appeal. Thus, the defendant is procedurally barred from asserting the issue raised in assignment of error number four.
Moreover, we note that it is the trier of fact's duty to weigh the testimony given by all of the witnesses, including the expert witnesses. Once an expert has been found qualified, the trier of fact is entitled to assess credibility and accept or reject the opinion of the expert in light of the expert's qualifications and the facts that form the basis of his or her opinion. State v. Lofton, 2008-0747 (La. App. 1st Cir. 9/12/08), 2008 WL 4190572, *2 (unpublished), writ denied, 2008-2661 (La. 5/22/09), 9 So.3d 140. The purpose of the testimony of an expert witness is to provide a basis of knowledge and background information on a subject. The role of the ultimate trier of fact is to relate the background knowledge gained from the expert to the facts established by evidence at trial and to ultimately make a determination of guilt or innocence. State v. Hillman, 613 So.2d 1053, 1058 (La. App. 3rd Cir.), writ denied, 617 So.2d 1181 (La. 1993). Although a witness may be recognized by the trial court as an expert, the trier of fact remains free to accept or reject the expert's conclusions.
*632 State v. Smith, 96-261 (La. App. 3rd Cir. 12/30/96), 687 So.2d 529, 552, writ denied, 97-0314 (La. 6/30/97), 696 So.2d 1004 ; State v. Ducksworth, 496 So.2d 624, 634 (La. App. 1st Cir. 1986). It is the duty of the trier of fact to weigh the testimony given by all of the witnesses, including the expert witnesses. Thongsavanh v. Schexnayder, 2009-1462 (La. App. 1st Cir. 5/7/10), 40 So.3d 989, 1004, writ denied, 2010-1295 (La. 9/24/10), 45 So.3d 1074
Trial courts are vested with great discretion in determining the competence of expert witnesses, and rulings on the qualifications of an expert witness will not be disturbed unless there was an abuse of that discretion. State v. Jarrell, 2007-1720 (La. App. 1st Cir. 9/12/08), 994 So.2d 620, 633 ; 1988 Comment (d) to LSA-C.E. art. 702 ("Broad discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert."). We find no abuse of the trial court's broad discretion in accepting the expert testimony at issue. The trial court was free to accept or reject the testimony. Accordingly, we find no merit in assignment of error number four.
BANK RECORDS
(Assignment of Error No. 5)
In assignment of error number five, the defendant argues that bank records were improperly admitted because there was no representative from either bank to lay a foundation for their admission or to testify as to the nature of the accounts, who or when the accounts were opened and closed, the signatories on the accounts, and bank procedures. The defendant notes that the business records exception to the hearsay rule requires that the custodian of records appear at trial for cross examination. The defendant contends that testimony presented by Joan Martin, the forensic accountant hired by the Guarisco family, was based on speculation and unreliable hearsay.
The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him...." Out-of-court statements that are testimonial are barred under the Confrontation Clause, unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witnesses. Crawford v. Washington, 541 U.S. 36, 68-69, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). In Crawford v. Washington, 541 U.S. at 68-69, 124 S.Ct. at 1374, the Supreme Court held that, where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation. However, the Crawford court drew a distinction between testimonial and nontestimonial statements, and confined its holding to testimonial evidence. Crawford, 541 U.S. at 61-68, 124 S.Ct. at 1370-74. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law ... as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." Crawford, 541 U.S. at 68, 124 S.Ct. at 1374. The Court noted that historically, in a criminal context, "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial," citing, as an example, business records. Crawford, 541 U.S. at 56, 124 S.Ct. at 1367.
Hearsay is an unsworn, out-of-court statement made by a person other than the testifying witness that is offered to prove the truth of the matter asserted. See LSA-C.E. art. 801. Hearsay statements are inadmissible unless they fall within one *633 of the recognized exceptions to the hearsay rule. See LSA-C.E. art. 802. Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status, subject to the requirements of Louisiana Code of Evidence article 803(6). To exclude business records from the hearsay rule and render them admissible, LSA-C.E. art. 803(6) requires the court to determine from testimony of either the "custodian or other qualified witness" that: (1) the record was made at or near the time of the event; (2) the record was made either by, or from information transmitted by, a person with knowledge; (3) the record was made and kept in the course of a regularly conducted business activity; (4) it was the regular practice of that business activity to make and keep such records; (5) the recorded information was furnished to the business either (a) by a person who was routinely acting for the business in reporting the information or (b) in circumstances under which the statement would not be excluded by the hearsay rule; and (6) neither sources of information nor the method or circumstances of preparation indicate a lack of trustworthiness. State v. Juniors, 2003-2425 (La. 6/29/05), 915 So.2d 291, 326-27, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006).
Evidence admissible as a hearsay exception under Article 803(6) does not require a showing of the unavailability of the declarant for hearsay purposes because Article 803(6) rests on the premise that the out-of-court statement is superior to what is likely to be produced in court. See State v. Marston, 2000-0589 (La. 3/16/01), 780 So.2d 1058, 1063 (per curiam). However, under Article 803(6), it is essential that a custodian or other qualified witness testimonially explain the record-keeping procedures of the business and thus lay the foundation for the admissibility of the records. Juniors, 915 So.2d at 326-327. The witness laying the foundation for the admissibility of business records need not have been the preparer of the records; however, the witness must be familiar with and able to testify from personal knowledge about the bookkeeping and accounting procedures of the entity whose business records are sought to be introduced. Juniors, 915 So.2d at 327.
Documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. But that is not the case if the regularly conducted business activity is the production of evidence for use at trial. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 321, 129 S.Ct. 2527, 2538, 174 L.Ed.2d 314 (2009). Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because-having been created for the administration of an entity's affairs and not for the purpose of proving or establishing some fact at trial-they are not testimonial. Melendez-Diaz, 557 U.S. at 324, 129 S.Ct. at 2539-40.
Thus, in light of Melendez-Diaz, we must address the nature of the regularly conducted business activity in this case in order to determine whether the bank records were properly admitted without the need for confrontation. Further, we must determine whether the bank records introduced in this case are testimonial, making their preparers subject to confrontation under the Sixth Amendment. Questions regarding the admissibility of evidence are within the discretion of the trial court and should not be disturbed absent a clear abuse of that discretion. See State v. Mosby, 595 So.2d 1135, 1139 (La. 1992).
In *634 Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006), the Supreme Court, in discussing the parameters of Crawford in the context of a police interrogation, held that statements are testimonial when the circumstances objectively indicate there is no ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. In Williams v. Illinois, 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the U.S. Supreme Court found no violation of the Confrontation Clause where an expert testified that the defendant's DNA profile matched a DNA profile which belonged to the perpetrator of a sexual assault and which was developed by another non-testifying expert. Therein, at trial, the prosecution called an expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of the defendant's blood. Williams, 567 U.S. at 56-58, 132 S.Ct. at 2227-2228.
In affirming the trial court's denial of defendant's motion to exclude the testimony under the Confrontation Clause, the U.S. Supreme Court in Williams stated:
[W]e also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory.
Williams, 567 U.S. at 58, 132 S.Ct. at 2228. The Court in Williams specifically noted that the abuses that prompted the adoption of the Confrontation Clause shared two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. Williams, 567 U.S. at 82, 132 S.Ct. at 2242.
Herein, Detective Trigg testified that the bank records at issue were obtained from the banking institutions pursuant to the issuance of a search warrant. As a CPA with many years of experience in litigation support, tax and audit, and quality control, Mrs. Martin was familiar with and had personal knowledge about the bookkeeping and accounting procedures of the bank records. Thus, although Martin was not the custodian of the bank records, she was a "qualified person" within the scope of LSA-C.E. art. 803(6). Further, there was no indication that the evidence at issue was not trustworthy. We also note that Martin and Detective Trigg were subject to cross-examination by the defense. Moreover, although the records at issue might prove useful in a prosecution related to charges similar to those in this case, they were not created for the primary purpose of proving or establishing some fact at trial. Thus, we cannot say that the regularly conducted business activity in this case is the production of evidence for use at trial. Accordingly, the bank records are non-testimonial, and as a result, the preparers of the records are not subject to confrontation under the Sixth Amendment and need not be subjected to cross-examination. In accordance with the above, we find no abuse of discretion in the admission of the bank records. Thus, assignment of error number five lacks merit.
*635 EXCESSIVE SENTENCES
(Assignment of Error No. 7/Patent Error)
In assignment of error number seven, the defendant contends that the sentences imposed in this case are excessive for a "hardworking grandfather whose role in the offenses was minuscule[.]" He notes that the composite twenty years without parole are tantamount to a life sentence for a sixty-three year old who is in poor health. He adds that the "without parole" restriction is not authorized by statute.
At the outset, we note that the defendant's oral motion to reconsider sentence did not include any ground. After the sentences were imposed, the defense counsel merely stated, "Judge, we'd like to orally move to reconsider the sentence." In response, the trial court asked, "You want to file an oral motion to reconsider the sentence?" The defense attorney responded positively, stating, "hm-hmm." Then, in denying the motion, the trial court stated, "I'll deny it." The record reveals that no written motion was filed thereafter. As set forth in LSA-C.Cr.P. art. 881.1(B), a motion to reconsider sentence "shall set forth the specific grounds on which the motion is based." A general objection to a sentence without stating specific grounds, including excessiveness, preserves nothing for appellate review. See State v. Campbell, 2016-1349 (La. App. 1st Cir. 4/12/17), 217 So.3d 1197, 1198 n.3. Under LSA-C.Cr.P. art. 881.1(E), the failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review. See State v. Mims, 619 So.2d 1059, 1059-1060 (La. 1993) (per curiam); State v. Jones, 97-2521 (La. App. 1st Cir. 9/25/98), 720 So.2d 52, 53. Thus, review of assignment of error number seven is procedurally barred.[14] See State v. David, 2006-1050, p. 7 (La. App. 1st Cir. 2/9/07), 2007 WL 437779 (unpublished); State v. Felder, 2000-2887 (La. App. 1st Cir. 9/28/01), 809 So.2d 360, 369, writ denied, 2001-3027 (La. 10/25/02), 827 So.2d 1173 ; State v. Duncan, 94-1563 (La. App. 1st Cir. 12/15/95), 667 So.2d 1141, 1143 (en banc, per curiam). Nonetheless, as discussed hereafter, the sentence imposed on count one must be vacated, due to the illegal restriction of parole.
In accordance with LSA-C.Cr.P. art. 920(2), all appeals are reviewed for errors patent on the face of the record. As noted by the defendant on appeal, the trial court imposed the defendant's sentence on count one (racketeering) without the benefit of parole. However, the penalty provision of the applicable statute, LSA-R.S. 15:1354(A), does not authorize such a restriction on the defendant's parole eligibility.[15] Thus, the parole restriction rendered *636 the sentence illegal. In State v. Williams, 2000-1725, (La. 11/28/01), 800 So.2d 790, 802, the Louisiana Supreme Court recognized that this Court has the authority to correct an illegal sentence despite the failure of either party to raise the issue in the district court or on appeal if the correction is ministerial. LSA-C.Cr.P. art. 882(A).
As the Supreme Court has previously admonished, "[t]o the extent that the amendment of defendant's sentence entails more than a ministerial correction of a sentencing error, the decision in [ Williams ] does not sanction the sua sponte correction made by the court of appeal on defendant's appeal of his conviction and sentence." State v. Haynes, 2004-1893 (La. 12/10/04), 889 So.2d 224 (per curiam). Herein, the sentencing error involves the restriction of sentencing "without" the benefit of parole. Specifically, on count one the trial court imposed twenty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, while the defendant faced a fine of not more than one million dollars, or imprisonment at hard labor for not more than fifty years, or both. LSA-R.S. 15:1354(A). Thus, despite the State's contention that this court has authority to delete the parole restriction on count one, we must vacate the sentence on count one and remand for resentencing on count one. See State v. LeBlanc, 2014-1455 (La. App. 1st Cir. 6/5/15), 174 So.3d 1187, 1189-90.[16] After a careful review of the record in these proceedings, other than the illegal parole restriction on the sentence on count one, we have found no reversible patent errors. See State v. Price, 2005-2514 (La. App. 1st Cir. 12/28/06), 952 So.2d 112, 123-25 (en banc), writ denied, 2007-0130 (La. 2/22/08), 976 So.2d 1277.
CONCLUSION
For the above and foregoing reasons, the defendant's convictions on counts 34, 39, 49, 57, 69, 73, 84, and 89 (theft of $1,500.00 or more) are modified to convictions of theft of property valued at $500.00 or more; the defendant's convictions and sentences on counts 87 and 751 are hereby reversed. The sentence on count 1 (racketeering) is vacated, and the matter is remanded for resentencing on count 1. All of the remaining convictions and sentence are hereby affirmed.
CONVICTIONS ON COUNTS 34, 39, 49, 57, 69, 73, 84, AND 89 REVERSED AND MODIFIED; CONVICTIONS ON COUNTS 87 AND 751 REVERSED; REMAINING CONVICTIONS AFFIRMED; SENTENCE ON COUNT 1 VACATED AND REMANDED FOR RESENTENCING ON COUNT 1; SENTENCES ON COUNTS 87 AND 751 REVERSED; REMAINING SENTENCES AFFIRMED.

See also LSA-R.S. 14:230(B)(1).

We note that as to the theft offenses committed between January 5, 1999 and August 2, 2010, in accordance with LSA-R.S. 14:67(B)(1) (prior to revision by 2010 La. Acts No. 585, § 1), the statutory threshold was "five hundred dollars or more."

The third amended bill of information lists 775 counts in total, including one count of racketeering, 674 counts of theft, and 100 counts of money laundering. Amongst those charges, as detailed above, the defendant herein has a total of 224 counts. Co-defendants Karen Dehart Duhon (the defendant's wife), Nelson-Tucker, L.L.C., DonnaSue Peveto, and A-B-C Siding Company of Morgan City, Inc., are also charged with various counts in the bill of information. DonnaSue Peveto pled guilty to multiple offenses and was deceased at the time of the trial. Also, the State filed notice to elect to sever the corporate defendants from the non-corporate defendants. The State further elected to sever the defendant and his wife, co-defendant Karen Dehart Duhon, and to try the defendant herein alone. The trial court overruled the defendant's objection to the severance and denied his motion to continue. The defendant then applied for supervisory review by this court; his request for stay was denied, and the writ was denied on the showing made. State v. Duhon, 2017-0800 (La. App. 1st Cir. 6/13/17), 2017 WL 2558332 (unpublished).

The trial court stated that the responsive verdicts were based on the statutory threshold at the time of those offenses. Thus, the responsive theft verdicts on counts 31 and 516, in accordance with LSA-R.S. 14:67(B)(1) (prior to revision by 2010 La. Acts No. 585, § 1), are specifically of a "value of five hundred dollars or more." The responsive verdicts on counts 570, 600, 638, 656, 657, 660, 665, 669, 675, 676, 687, 690, and 761, in accordance with LSA-R.S. 14:67(B)(2) (prior to revision by 2014 La. Acts No. 255, § 1), are specifically of a "value of five hundred dollars or more, but less than a value of one thousand five hundred dollars."

As further discussed herein, while checks for Mrs. Duhon and the defendant's MidSouth Bank joint account bore the CMCI company name, they were not authorized to use the company name on their personal checks and CMCI was not, in actuality, affiliated with the account.

Munson noted that since the bookkeeping for 2013 was prepared by LeGlue and Company, the firm that he worked for at the time of the trial, there was no attempt to hide the excess compensation of $249,000.00 paid to Mrs. Duhon and Peveto during 2013.

The defendant further states: "[m]oreover, since the State's theory is that the money in the MidSouth account was already taken from MCMI [sic], to charge that the same money was taken a second time violates the Double Jeopardy Clause." However, the defendant has not raised a claim of double jeopardy in an assignment of error on appeal.

The following electronic images were submitted: cancelled checks and checking deposit tickets from MidSouth Bank drawn on the account of CMCI each bearing the maker's signature reading "Armond Duhon" and handwritings identified as containing known genuine handwriting exemplars of the defendant.

The checks for the "fake" CMCI MidSouth account bore the name "Capital Management Consultants, Inc." on the top line, "Armond Duhon" immediately underneath, followed by "Karen Duhon" and a Morgan City post office box address and phone number. The evidence further includes fake CMCI Iberia Bank deposit slips that bore the name "Armond Duhon" on the top line, "Capital Management Consultants, Inc." on the second line, followed by "Karen Duhon" and purported social security numbers, and a Morgan City post office box address and phone number.

We note that despite the modified convictions, there is no need to remand for resentencing on counts 34, 39, 49, 57, 69, 73, 84, and 89, as the sentences previously imposed by the trial court, of eight years imprisonment at hard labor as to each count, fall within the statutory range at the time of the offenses, namely, not more than ten years imprisonment with or without hard labor. See LSA-C.Cr.P. 14:67(B)(1) (prior to revision by 2010 La. Acts No. 585, § 1).

We note that while the amended version of Article 780 is applicable to the instant case, the cases relied upon by the defendant on appeal previously named herein, Page and Bryant, were decided prior to the above detailed amendment of Article 780 and the jurisprudence outlined hereafter applying the amended version of the article. Moreover, the court in Bryant found that the trial court was not required to personally inform the defendant of his right to a trial by jury. In doing so, the court noted that the Supreme Court has rejected an absolute rule that would require the trial judge to personally inform the defendant of his right to a jury trial. Kahey, 436 So.2d at 486. In his brief, the defendant cites Bryant for the proposition that the trial judge personally addressed the defendant therein, "but was not thorough in his questioning or explanation." However, the defendant fails to acknowledge that the appellate court in Bryant found no merit in the defendant's assertion therein that he did not knowingly and intelligently waive his right to a trial by jury.

The defense attorney argued under LSA-C.Cr.P. art. 851(B)(1) that the verdicts were contrary to the law and the evidence concerning the racketeering and theft convictions. Citing subsections (B)(2) and (B)(5) of Article 851, the defense attorney additionally argued that the trial court erred in overruling his objection to the admission of bank records without having the custodian present, and, finally, that the ends of justice would be served to grant a new trial.

The presentence investigation report indicates that among several arrests and charges that were nol prossed or dropped, the defendant formerly pled guilty to resisting an officer in 1974, simple battery in 1978, and operating a vehicle while intoxicated, first offense in 2001.

We note that the State appears to conclude that the defendant is entitled to review of a bare claim of excessiveness in this case. However, this court has specifically held that the defendant, in an oral or written motion, would have to raise the ground of excessiveness in order to preserve such appellate review. The defendant has failed to do so in this case. See Mims, 619 So.2d at 1059-60 ; State v. Morris, 99-3075 (La. App. 1st Cir. 11/3/00), 770 So.2d 908, 929, writ denied, 2000-3293 (La. 10/12/01), 799 So.2d 496, cert denied, 535 U.S. 934, 122 S.Ct. 1311, 152 L.Ed.2d 220 (2002) ; State v. Andrews, 94-0842 (La. App. 1st Cir. 5/5/95), 655 So.2d 448, 454.

As noted, this patent sentencing error on count one was urged by the defendant in conjunction with his excessive sentence argument in assignment of error seven, and the State conceded as to the error in its reply brief.

In State v. Templet, 2005-2623 (La. App. 1st Cir. 8/16/06), 943 So.2d 412, 422, another panel of this court sua sponte amended a sentence to delete the illegal portion of the sentence and remanded solely for the correction of the minutes, notwithstanding this court's decision in State v. Paoli, 2001-1733 (La. App. 1st Cir. 4/11/02), 818 So.2d 795, 799-800, writ denied, 2002-2137 (La. 2/21/03), 837 So.2d 628, and the clear dictates of Haynes, 889 So.2d at 224. However, given the Supreme Court's decision in Haynes, notions of judicial efficiency cannot override the judicial discretion reserved to the trial court.